NOTICE

Decision filed 09/23/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 210116-U

NO. 5-21-0116

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* BRAXTON S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Madison County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| v. | ) | No. 19-JA-32 |
| | ) | |
| Jason B., | ) | Honorable |
| | ) | Amy Maher, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Moore and Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's finding that the respondent was an unfit parent was not against the manifest weight of the evidence, and the circuit court's termination of the respondent's parental rights was not against the manifest weight of the evidence.

¶ 2    The respondent, Jason B., appeals from the judgment of the circuit court that terminated his parental rights to his natural child, Braxton S. For the following reasons, we affirm.

1

¶ 3                              I. BACKGROUND

¶ 4     Braxton was born in February 2019. The respondent is Braxton's natural father. When Braxton was born, his mother, Amy, had a drug addiction; already had five other children removed from her care due to her substance abuse; had used methamphetamine, cocaine, alcohol, and marijuana while pregnant with Braxton; and had been previously found unfit five times. Tracie and Kenny S., who are Braxton's relatives, began caring for Braxton after he was released from the hospital after his birth. Three days after Braxton's birth, the State filed a petition alleging that Braxton was neglected as defined in section 2-3(1)(a) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(a) (West 2018)), in that neither the respondent nor Amy was providing Braxton with the proper or necessary support, education, and medical or other remedial care necessary for a minor's well-being, including adequate food, clothing, and shelter. In addition, the State alleged that the respondent failed to provide any care, support, or concern for Braxton and failed to establish his paternity after Braxton's birth. The circuit court granted the Department of Children and Family Services (DCFS) temporary custody of Braxton and ordered a DNA test to establish the respondent's paternity, which later established that the respondent was Braxton's father.

¶ 5     In April 2019, DCFS prepared an adjudication/dispositional report in which a DCFS caseworker reported that she had met with the respondent three times since Braxton's birth, but the respondent had not been able to provide an address or proof of residence, appeared to be homeless, and had a strong body odor. The caseworker believed that the respondent did "not seem to fully understand the issues and why Braxton [was] not able to live with

2

him." The caseworker had requested a residential address and proof of employment, but the respondent was "resistant to provide the information" and had given the caseworker "inconsistent stories and information." The respondent reported that he had two other children but that he was unable to actively parent those children due to a tumultuous relationship with the children's mother. The respondent admitted to using marijuana regularly and using other substances occasionally. The respondent had a "past criminal history" but stated that he wanted to be a good father for Braxton. The caseworker reported that the respondent had regular visits once a week with Braxton from 10 a.m. to 11 a.m. at the DCFS office. The caseworker concluded that the respondent did not seem to acknowledge any problems and was ready to provide for his son but had not provided an address to a home in which he planned to parent Braxton.

¶ 6     DCFS's service plan for the respondent for reuniting the respondent with Braxton included the following tasks: (1) complete an integrated assessment and follow recommendations, (2) complete a mental health assessment and follow recommendations, (3) complete substance abuse assessment and follow recommendations, (4) complete random drug screens, (5) complete parenting education, (6) provide suitable housing and stabilization in this residence, (7) obtain and maintain employment, and (8) complete a domestic violence assessment and follow recommendations. In April 2019, the caseworker rated the respondent's progress in completing each of these tasks as "unsatisfactory."

¶ 7     With respect to mental health and substance abuse tasks and services, the respondent reported to the caseworker that he was receiving services through Centerstone and had signed a release of that information for the caseworker to review. However, the caseworker

3

reported that when she contacted the agency, she was informed that they had no records of the respondent receiving services through Centerstone.

¶ 8 On April 23, 2019, the circuit court entered an adjudicatory order finding that Braxton was neglected in that he suffered from a lack of support, education, and remedial care and that Braxton was in an environment that was injurious to his welfare. The circuit court also entered a dispositional order making Braxton a ward of the court and placing him in the custody and guardianship of DCFS. The circuit court found that the respondent was unfit to care for, protect, train, educate, supervise, or discipline Braxton. The circuit court found that DCFS's service plan and the services offered in conjunction with the service plan were appropriate, but that the respondent had not yet completed the service plan tasks. The circuit court's dispositional order included an admonishment to the respondent that he "must cooperate with [DCFS]" and "comply with the terms of the service plan and correct the conditions that require[d] [Braxton] to be in care" or he risked the termination of his parental rights. The circuit court's permanency goal was return home within 12 months, and the circuit court set a permanency hearing for October 8, 2019.

¶ 9 In October 2019, prior to the permanency hearing, a caseworker, Gretchen Truax, filed a permanency hearing report in which she reported that the respondent had been cooperative with her but had "not been consistent in engagement in his services." Truax rated the defendant satisfactory in cooperating with her but rated him unsatisfactory with respect to most of the other tasks required by the service plan.

¶ 10 Truax noted in her report that the respondent had been receiving counseling at Centerstone to address mental health needs and to develop tools for addressing anger

4

issues. However, the respondent left counseling in July 2019 before he had completed his goals. He was unsuccessfully discharged from Cornerstone's care. The respondent was referred to another counselor but had not reengaged the prescribed counseling.

¶ 11 In her report Truax also noted that the respondent had not provided paystubs to prove his employment because, he claimed, he often worked for cash. In addition, the respondent had not provided Truax with a residential address and had not provided any information concerning his roommates for purposes of running background checks on the other adults in the home. The respondent had attended parenting classes and during his visits with Braxton, the respondent demonstrated the parenting skills he learned, but at the time of the report, he had not finished all the parenting classes in the program. Truax rated the respondent as having made satisfactory progress with the parenting classes task at that time.

¶ 12 Truax reported that the respondent regularly visited with Braxton during the period covered by the report, attending 18 out of 20 offered visits. According to Truax, during the visits, the respondent parented Braxton in a safe manner and supported bonding by practicing healthy parenting techniques. The respondent came to the visits prepared with formula and diapers and took suggestions and corrections well. Truax's recommended permanency goal for the respondent remained "return home within 12 months."

¶ 13 On October 8, 2019, the circuit court entered a permanency order finding that the respondent had not made reasonable and substantial progress, nor made reasonable efforts, toward returning Braxton home and had not completed all service plan tasks. The circuit court's order kept the permanency goal as "return home within 12 months" and directed

the respondent to cooperate with DCFS and its service plan, finding that the service plan was appropriate and reasonably calculated to facilitate the achievement of the permanency goal of reuniting the respondent and Braxton. The court scheduled the next permanency hearing for March 10, 2020.

¶ 14 On March 10, 2020, Amy signed a final and irrevocable consent to the adoption of Braxton by Tracie and Kenny. On the same day, Truax filed a permanency hearing report in which she reported that the respondent was minimally engaged with her and that the respondent's communication with her was inconsistent. The respondent had not reengaged in anger management services and mental health services, failed to provide paystubs, and had not provided information concerning his roommates for background checks. The respondent had completed an assessment for substance abuse at a treatment facility and was referred to a counselor, but he had not attended the appointment. The respondent had attended some parenting classes, failed to complete the classes, but had reengaged in classes as of February 26, 2020.

¶ 15 With respect to visits with Braxton, Truax reported that the respondent continued to visit with Braxton regularly until the end of September 2019, when the respondent reengaged his relationship with Amy. The respondent did not visit with Braxton in October and November 2019, but the visits resumed after the respondent's relationship with Amy ended.

¶ 16 On March 10, 2020, the circuit court entered a second permanency order finding that the respondent had not made reasonable and substantial progress, nor reasonable

6

efforts, toward returning Braxton home and had not completed all service plan tasks. The circuit court's permanency goal remained returning Braxton home within 12 months.

¶ 17 Truax filed another permanency hearing report on July 2, 2020. In this report, Truax wrote that the respondent had been consistently engaged with her since the last permanency hearing in March 2020. The respondent still had not started anger management services but had discussed it with his substance abuse counselor. The respondent reported that he had been furloughed from his employment and worked side jobs for cash. The respondent had obtained housing, but the home did not pass a safety check due to a lack of fire alarms. The home otherwise met minimum standards. At the time of Truax's report, the respondent had been in this home since March 2020, but he had two days to come up with $500 for the next month's rent. Truax noted in her report that the respondent's service plan required him to maintain a home for six months, but the respondent had been unable to maintain a home for six months since the case was opened.

¶ 18 Truax wrote in her report that the respondent completed assessments for substance abuse and began attending counseling sessions regularly, and the respondent had also completed a mental health assessment. Truax rated the respondent's progress as satisfactory with respect to cooperation, substance abuse assessment, and mental health assessment although those tasks remained incomplete. Truax rated the respondent's progress as unsatisfactory with respect to tasks that addressed anger management, employment, housing, and parenting education. In her report, Truax recommended a permanency goal of "substitute care pending court determination on termination of parental rights."

¶ 19    The circuit court scheduled a permanency hearing for October 8, 2020. Prior to the hearing, on September 28, 2020, Truax filed a best interest report in which she described the respondent's efforts and progress. With respect to cooperation, Truax reported that there were times in which the respondent was disengaged and inconsistent, but over the life of the case, the respondent had largely cooperated with her. Therefore, she rated the respondent as satisfactory with respect to his cooperation. However, Truax rated the respondent's progress as unsatisfactory with respect to substance abuse services, mental health treatment, parenting, anger management, housing, and employment. Truax recommended that the circuit court change the permanency "goal to adoption provided father's rights have been terminated" because the respondent had "failed to make consistent progress in his services throughout the life of the case." Truax also explained that the respondent had toxic relationships with the mothers of his children as evidenced by multiple times the police and/or DCFS had been called to "intervene in their affairs."

¶ 20    On October 2, 2020, the State filed a petition requesting the circuit court to enter an order terminating the respondent's parental rights and appointing a guardian with the power to consent to Braxton's adoption. The State alleged that the respondent was an unfit person pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). Specifically, the State alleged that the respondent was unfit because he (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of Braxton (*id.* § 1(D)(b)); (2) failed to make reasonable progress toward the return of Braxton to his care during any nine-month period beginning April 23, 2019, through the date of filing the petition (*id.* § 1(D)(m)(ii)); and (3) failed to make reasonable efforts to correct

8

the conditions that were the basis for the removal of Braxton from the parent during any nine-month period beginning April 23, 2019, through the date of filing the petition (*id.* § 1(D)(m)(i)).

¶ 21 On October 20, 2020, the circuit court entered a third permanency order finding that the respondent had failed to make reasonable efforts toward returning Braxton home and had failed to make reasonable and substantial progress toward returning Braxton home. The circuit court kept the permanency goal as "return home within 12 months" and set the next permanency hearing date for December 10, 2020.

¶ 22 On November 30, 2020, prior to the next permanency hearing, Truax filed another best interest report. In this report, Truax rated the respondent as "satisfactory" with respect to his cooperation and mental health assessment. During the period of the report, the respondent properly communicated with Truax, and the respondent had consistently attended mental health counseling sessions. However, Truax continued to rate the respondent's progress as unsatisfactory with respect to substance abuse services, parenting, anger management, housing, and employment. Truax noted that the respondent was consistent in visiting with Braxton one hour per week at DCFS's office and that the respondent was "sweet and interact[ed] with his son in a safe manner during visits." However, the respondent struggled "a bit to connect with Braxton and use[d] his phone to watch children's music videos to try to help entertain [Braxton] during visits." Truax continued to recommend the permanency goal of substitute care pending the termination of the respondent's parental rights.

9

¶ 23    The circuit court continued the December 10, 2020, permanency hearing to April 20, 2021. Prior to the April 20, 2021, hearing, Truax filed another best interest report in which she rated the respondent as "unsatisfactory" in all tasks except parenting. With respect to cooperation, Truax reported that the respondent had withheld his residential address from her since July 2020, which prevented her from monitoring his home environment.

¶ 24    With respect to drug abuse counseling, Truax reported that in September 2020, the respondent had stopped attending counseling sessions for substance abuse and was unsuccessfully discharged from that service, although the respondent reengaged with his substance abuse counselor in January 2021. Truax also noted that the respondent had failed to appear for drug testing five times during the period of June 2019 through December 2020 and tested positive for "THC and/or creatinine" on seven occasions beginning in June 2020 through February 2021.

¶ 25    With respect to mental health services, Truax reported that since June 2020, the respondent had been consistent in participating in telehealth sessions with his mental health counselor and had addressed some of his past trauma and history. However, the respondent remained guarded with Truax and his counselor, particularly when discussing his living situation. Truax explained in her report that, because of the respondent's past toxic relationships and his lack of openness and honesty about his living situation, it was unclear to Truax whether the respondent had acquired the skills necessary to develop healthy relational boundaries to minimize the risk for toxic relationships that could, in turn, create risks for Braxton, who was unable to self-protect.

10

¶ 26    With respect to anger management, Truax noted that the respondent successfully completed an anger management program, but Truax also noted that the respondent had openly shared "that in his past that he [had] struggled to control his anger." Truax reported that, at the time of the report, the respondent was maintaining an alcohol-free lifestyle, which had helped the respondent regulate his anger, but Truax also reported that "due to [the respondent] withholding where he is living [she had] been unable to confirm if there [had] been any incidents of violence recently." Therefore, she rated the respondent's anger management as unsatisfactory.

¶ 27    With respect to parenting, Truax rated the respondent as satisfactory in that the respondent had engaged in several services that were interrupted by COVID-19, but at the time of the report, the respondent had reengaged with a parenting education course and was attempting to complete the program.

¶ 28    With respect to housing, Truax reported that the respondent had lived in six different homes over the 19-month period preceding her report. The respondent was "not always forthcoming about where exactly it is that he [was] living" and failed to provide Truax with information she needed to determine the safety of the respondent's home. At the time of the report, the respondent had failed to provide Truax with his current address.

¶ 29    Finally, with respect to employment, Truax noted that the respondent had held at least three jobs for a period no longer than three to five months and that the respondent reported that he completed side projects on vehicles and homes to make ends meet.

¶ 30    The visitation plan for the respondent called for one hour supervised visits each week. Truax reported that, at times, the respondent put other priorities ahead of visits and,

11

at one point, stopped visiting Braxton altogether for 16 straight weeks. However, since the reinstatement of visits, the respondent had attended all but one of his visits. Truax continued to recommend the goal of adoption of Braxton provided that the respondent's parental rights were terminated.

¶ 31 On April 20, 2021, the parties appeared in court for a hearing on the State's petition for the termination of the respondent's parental rights. The circuit court first conducted a hearing on the State's allegation that the respondent was unfit as defined in the Adoption Act. Truax was the only witness to testify at the hearing.

¶ 32 Truax's testimony at the hearing was consistent with her statements and opinions concerning the respondent's efforts and progress set out in her best interest report described above. Truax explained to the circuit court that she was the second caseworker assigned to work with the respondent and Braxton and that she had been working with the respondent since May 2019. Truax testified about preparing service plans for the respondent and reviewing the service plans every six months.

¶ 33 Truax described the respondent as being respectful, kind, and compassionate but at times uncooperative by not returning phone calls or being upfront about things when things were not going well for the respondent. Truax testified that she never rated the respondent as satisfactory with respect to his service plan at any point during the case. She explained that were periods in which she would not hear from the respondent for several months at a time, and the respondent was not upfront and honest with her about certain things including his employment, changes in his address and phone number, and who he was living with.

12

¶ 34    Truax testified that one of the tasks the respondent was assigned involved participating in substance abuse counseling. Truax told the court that the respondent participated in an assessment in May 2019, but he did not successfully complete the recommended counseling sessions and was unsuccessfully discharged after leaving the program in July 2019 against staff advice. After the respondent was unsuccessfully discharged, Truax arranged for a second assessment in February 2020 at another facility, but the respondent missed treatment sessions and was unsuccessfully discharged from this second program in March 2020. The respondent participated in a third assessment in May 2020. The respondent attended sessions consistently for a period following the third assessment, but he was again unsuccessfully discharged from the program at the end of September 2020. Truax told the court that between April 23, 2019, and October 2, 2020, the respondent was never rated as "satisfactory" with respect to the substance abuse aspect of the service plan.

¶ 35    Truax also told the circuit court that the respondent was never rated as "satisfactory" with respect to the mental health portion of the service plan at any time between April 23, 2019, and October 2, 2020. Truax explained that the respondent completed a mental health assessment in May 2019, and the assessment resulted in a recommendation of outpatient treatment. The respondent attended mental health counseling for a period, but he was unsuccessfully discharged from the program in July 2019 for nonattendance. At this time, Truax tried to speak with the respondent about mental health counselling, but Truax explained that there were times when she had difficulty in getting ahold of the respondent, particularly in the fall of 2019. When she did speak to the respondent, she provided him

13

with new referrals for additional mental health services and emphasized the need for him to "get reengaged" in those services.

¶ 36 The respondent eventually had a second mental health assessment in April or May 2020 and began attending counselling sessions again. However, both Truax and the mental health counselor had concerns about the respondent being guarded about his housing situation and not being forthright about that situation. Truax explained to the court that the respondent had a history of anger, aggression, and toxic relationships, particularly with his ex-wife. Truax testified: "So, when I don't know where he's living, I can't follow up and monitor if there have been any calls to his house, who he's living with, run background checks and see if he's making safe decisions on who it is that he lives with." Truax told the court that she spoke with the respondent about his need to provide her with information relevant to his living situation. She explained that it was difficult to evaluate the respondent's progress when she did not have information about all aspects of his life, particularly information relevant to the toxic relationships the respondent had in the past.

¶ 37 Truax testified that the respondent was referred for parenting classes, and the respondent was initially engaged in parenting services in May or June 2019. However, the respondent stopped attending the classes in the fall of 2019 when he renewed his relationship with Braxton's mother, Amy. The respondent resumed parenting classes in January 2020, but he had to retake the classes he had completed due to the time he was away from the program. The program shut down due to COVID-19 concerns when the respondent was a few classes short of completing the program. Truax referred the respondent to an online parenting education program, but the respondent did not want to

start a new program and elected to wait until the previous program reopened. During the period of April 23, 2019, through October 2, 2020, the respondent failed to successfully complete any parenting program.

¶ 38    Truax told the circuit court that the respondent was to complete anger management services that could be included with his mental health services. However, according to Truax, the respondent never completed anger management services, although he was provided with the opportunity. Truax was concerned with the respondent's anger and the need for anger management services because, according to Truax, the respondent had a violent history. During the period from April 23, 2019, through October 2, 2020, the respondent did not successfully engage in anger management treatment and was never rated as "satisfactory" for this service plan task.

¶ 39    The respondent's service plan required him to obtain suitable housing, and Truax testified that she needed to see at least six months of stability in a home. Truax testified that the respondent was inconsistent with his living arrangements, having lived at six different households during the case and sometimes lived in locations that he did not divulge to Truax. He refused to provide Truax with information concerning any of his roommates, which prevented Truax from running background checks on the roommates. The respondent's living arrangements were an ongoing issue during the case, and Truax explained that without information to do background checks, she could not know who was living in the respondent's home or what potential safety concerns may be present. As of the date of the hearing, the respondent had not provided Truax with current information concerning where he was living and who he was living with. Truax offered the respondent

assistance with his housing, but the respondent was not open to any referrals for housing assistance. Between April 23, 2019, and October 2, 2020, the respondent was never rated as "satisfactory" with respect to the service plan's housing requirements.

¶ 40    Truax testified that the respondent was also never rated as "satisfactory" with respect to the employment aspect of the service plan. The respondent reported that he performed side jobs for cash, which made it difficult for Truax to determine whether the respondent was maintaining sufficient employment. The respondent was inconsistent in showing that he could maintain employment at one location for any length of time, having had multiple employers throughout the case. Truax explained to the court that she repeatedly discussed with the respondent the need for him to have steady employment. For the period of April 23, 2019, through October 2, 2020, Truax never rated the respondent as "satisfactory" with the employment requirement of the service plan due to the respondent's lack of stable employment.

¶ 41    Truax told the circuit court that from April 23, 2019, through October 2, 2020, the respondent's service plan never changed because the services offered addressed the safety concerns that were the barrier to unification between the respondent and Braxton. The respondent was given one hour of supervised visitation per week, and that visitation schedule never changed because the respondent never achieved satisfactory progress with his service plan, and in the fall of 2019, the respondent stopped visits and services altogether for 16 weeks. Accordingly, Truax believed the respondent to be unfit. According to Truax, Braxton needed consistency and stability, which the respondent failed to demonstrate for any reasonable amount of time.

16

¶ 42   At the conclusion of the hearing, the circuit court found that the respondent had "failed to make reasonable efforts and failed to make reasonable progress for the return of the minor during the relevant time period." The circuit court, therefore, found the respondent to be unfit at the conclusion of the fitness hearing.

¶ 43   On the same day as the fitness hearing, the circuit court also conducted a separate hearing on whether it was in Braxton's best interest that the respondent's parental rights be terminated. During this hearing, Truax told the court that Braxton lived in Tracie and Kenny's home, along with Braxton's older maternal half-brother. Tracie and Kenny's home had been Braxton's only placement, and the placement began immediately after Braxton left the hospital after his birth. Tracie and Kenny's home was the only home Braxton had ever lived in.

¶ 44   At the time of the hearing, Braxton was two years old, and Truax told the court that Braxton had bonded with Tracie and Kenny as his caregivers. Tracie and Kenny had cared for Braxton, supported him, and met his needs, and Braxton looked to Tracy and Kenny for his needs. It appeared to Truax that Braxton felt at home with Tracie and Kenny. In addition, Tracie and Kenny had been committed to keeping a sibling connection between Braxton and his five older maternal half brothers and sisters by arranging for the siblings to get together regularly every month. According to Truax, Tracie and Kenny "continually put Braxton's best interest first even when it comes at their cost and an inconvenience to them." Truax told the court that Tracie and Kenny were willing to adopt Braxton should the respondent's parental rights be terminated and were supportive of keeping some

connection between Braxton and his natural parents as long as they could ensure Braxton's safety.

¶ 45    Truax believed that termination of the respondent's parental rights would not be detrimental to Braxton because Braxton was "in the place he's always known as home." Truax  believed that it was in Braxton's best interest for the respondent's parental rights to be terminated and Braxton be made available for adoption. The guardian *ad litem* agreed with Truax's recommendations.

¶ 46    At the conclusion of the hearing, the circuit court found that it was in Braxton's best interest to terminate the respondent's parental rights and make Braxton available for adoption. The court stated: "And for this child's entire life he's been in the same placement, and the father has only very recently indicated by his actions that he's ready to step up to the plate. And for the best interests of the minor I just don't think we can wait any longer." The circuit court entered a judgment terminating the respondent's parental rights and granted DCFS power to consent to Braxton's adoption. The respondent now appeals from the circuit court's judgment.

¶ 47                                II. ANALYSIS

¶ 48    The Juvenile Court Act (705 ILCS 405/1-1 *et seq*. (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq*. (West 2020)) govern proceedings involving the termination of parental rights. *In re D.F*., 201 Ill. 2d 476, 494 (2002). Specifically, the Juvenile Court Act provides a two-stage process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds of unfitness

18

enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *In re D.T.*, 212 Ill. 2d 347, 352-53 (2004). When the State alleges more than one ground for a finding of unfitness, the State needs to prove only one ground for the circuit court to find a parent unfit. *In re J.A.*, 316 Ill. App. 3d 553, 564 (2000). If the circuit court finds the parent unfit, the State must then show, in a separate haring, that termination of parental rights would serve the child's best interests. *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 28.

¶ 49    In the present case, the respondent first argues that the circuit court erred in finding him to be an unfit person on the ground that he did not make reasonable progress towards the return of the minor children during any nine-month period following the adjudication of abuse or neglect (750 ILCS 50/1(D)(m)(ii) (West 2020)). The respondent also argues that the circuit court erred in finding that he had not made reasonable efforts to correct the conditions that were the basis for the removal of the minor children during any nine-month period following the adjudication of abuse or neglect (*id.* § 1(D)(m)(i)). In addition, the respondent challenges the circuit court's finding that it was in Braxton's best interest that the respondent's parental rights be terminated.

¶ 50                              (a) Unfitness

¶ 51    The State bears the burden of proving by clear and convincing evidence that the parent is unfit, and we may affirm if the evidence supports a finding of unfitness on any one of the alleged statutory grounds. *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 28. Section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2020)) provides

19

for finding a parent unfit where the parent has failed to make reasonable progress towards the return of the child during any nine-month period following the adjudication of neglect.

¶ 52    Reasonable progress is an objective standard that focuses upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17. Measuring reasonable progress under section 1(D)(m)(ii) of the Adoption Act encompasses the parent's compliance with the service plans in light of the conditions giving rise to the removal of the minor child, while also considering other conditions which may later arise preventing the return of the child to the parent. *Id.* A parent's failure to substantially fulfill his or her obligations under the service plan is substantially a parent's failure to make reasonable progress toward the return of the minor child. *Id.*

¶ 53    Further, a determination of parental unfitness involves factual findings and credibility assessments that the circuit court is in the best position to make, and a finding of unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re Tiffany M.*, 353 Ill. App. 3d 883, 889-90 (2004). "A factual finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the determination is unreasonable, arbitrary, and not based on the evidence." *Id.* at 890.

¶ 54    In the present case, the circuit court's finding that the respondent failed to make reasonable progress toward the return of Braxton during any nine-month period following the adjudication of neglect is supported by the manifest weight of the evidence. The State presented sufficient evidence of the respondent's lack of progress during the period of April 23, 2019, through October 2, 2020, a period greater than nine months.

20

¶ 55 During this period, the respondent was required to cooperate with his caseworkers, but there were periods in which he failed to keep Truax informed about important things relevant to his service plan, including where he was living, who he was living with, and where he was working. There were times in which Truax would not hear from the respondent for several months. Truax told the court that the respondent was never rated satisfactory with respect to his service plan at any point during this period.

¶ 56 The respondent attended some substance abuse counseling sessions but was unsuccessfully discharged in July 2019 when he left the program against staff advice. Truax provided additional referrals to substance abuse programs, but the respondent was again unsuccessfully discharged in March 2020 due to missed sessions and failure to follow through on counseling recommendations. A third attempt at substance abuse services in May 2020 resulted in another unsuccessful discharge in September 2020. The respondent never made satisfactory progress in performing this task required by the service plan.

¶ 57 The same is true with respect to mental health services. After a mental health assessment, it was recommended that the respondent engage in outpatient treatment to address mental health issues. Again, the respondent failed to follow through with recommendations and was unsuccessfully discharged from mental health services in July 2019. Truax made additional referrals, and the respondent reengaged in mental health services, but the respondent remained guarded about his housing situation which prevented Truax from evaluating the respondent's progress with respect to addressing toxic relationships, which was a significant element of the respondent's past mental health

21

issues. Truax never rated the respondent as "satisfactory" with respect to addressing mental health issues.

¶ 58 The service plan required the respondent to engage in anger management services, and Truax gave the respondent the option to address that task along with his mental health services. During the relevant period, the respondent never successfully engaged in anger management treatment, although he was provided the opportunity to do so. The respondent's service plan required him to engage in parenting classes. Truax referred the respondent for such services, but the respondent failed to complete parenting classes during the relevant period. From the fall of 2019 through November 2019, the respondent resumed his relationship with Braxton's mother, Amy, and during this time, the respondent stopped attending parenting classes and most of the other services required by the service plan as well. The respondent never successfully completed parenting education during the relevant period.

¶ 59 The respondent knew that keeping Truax informed of his living arrangements was a crucial part of the service plan because Truax needed to know that the respondent's home environment was appropriate and safe for Braxton. Truax explained that this was a crucial part of the service plan due to the respondent's history of toxic relationships and aggression. Truax needed to monitor the respondent's living situations, but the respondent prevented her from doing so by failing to provide her with sufficient information for her to conduct the necessary home checks. The respondent, therefore, prevented Truax from determining whether he was making safe decisions and prevented Truax from running background checks of anyone living with the respondent to ensure that Braxton would be

22

safe. Truax explained that the respondent's failure to communicate about his living situation was an ongoing issue throughout the life of the case. With respect to the respondent's employment, the respondent was inconsistent in showing that he was able to maintain stable employment, although the respondent knew that was a required task of his service plan.

¶ 60    The circuit court had reviewed the service plan and found that the service plan's required tasks were appropriate to address the safety concerns that were the barrier to the reunification of the respondent and Braxton. Truax believed, and the circuit court agreed, that the respondent was unfit due to his inconsistency for long periods of time with respect to completion of the service plan tasks.

¶ 61    As noted above, reasonable progress is an objective standard that focuses upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17. In the present case, the respondent had over 17 months to complete his service plan tasks from the time Braxton was taken into DCFS's care shortly after Braxton's birth. The respondent had the opportunity to complete his plan tasks, but he failed to do so. Therefore, based on the record before us, we cannot conclude that the circuit court's finding of unfitness, based on failure to make reasonable progress, was against the manifest weight of the evidence. Therefore, we affirm the circuit court's finding that the respondent was an unfit person as defined in section 1(D)(m)(ii) of the Adoption Act based on the respondent's failure to make reasonable progress toward the return of Braxton during any nine-month period following the adjudication of neglect.

¶ 62    As noted above, the State must prove only one count of unfitness for the circuit court to find that the respondent was an unfit person. *In re J.A.*, 316 Ill. App. 3d at 564. Because we have affirmed the circuit court's finding of unfitness pursuant to section 1(D)(m)(ii) of the Adoption Act, we do not need to address the respondent's argument that the circuit court's finding of unfitness pursuant to section 1(D)(m)(i) of the Adoption Act was against the manifest weight of the evidence.

¶ 63                              (b) Best Interest

¶ 64    The respondent also argues that the State failed to prove that the termination of his parental rights was in Braxton's best interests. "At the best-interest stage of termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination [of parental rights] is in the child's best interest." *In re Jay H.*, 395 Ill. App. 3d 1063, 1071 (2009). The appellate court will reverse the circuit court's best-interest determination only if it was against the manifest weight of the evidence. *Id.* A best-interest determination is against the manifest weight of the evidence only if the facts clearly establish that the circuit court should have reached the opposite result. *Id.*

¶ 65    At the best-interest stage of termination proceedings, " 'the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life.' " *In re T.A.*, 359 Ill. App. 3d 953, 959 (2005) (quoting *In re D.T.*, 212 Ill. 2d at 364). The circuit court takes into consideration the best-interest factors in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2018)). Specifically, pursuant to section 1-3(4.05) of the Juvenile Court Act, in determining the best interests of the child, the circuit court must consider the following statutory factors in the context of the child's

24

age and developmental needs: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments, including where the child feels love, attachment, and a sense of being valued, the child's sense of security, the child's sense of familiarity, the continuity of affection for the child, and the least disruptive placement alternative for the child; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, which includes a need for stability and continuity of relationships with parent figures, siblings, and other relatives; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2020). The circuit court is not required to make specific findings of fact concerning the best-interests factors as long as there is some indication in the record that it considered the enumerated factors when making the best-interests determination. *In re Marriage of Stribling*, 219 Ill. App. 3d 105, 107 (1991).

¶ 66    In the present case, after carefully reviewing the record and in light of the best-interest factors that must be considered, we cannot reverse the circuit court's determination to terminate the respondent's parental rights. The circuit court heard the testimony regarding the bond between Braxton, Tracie, and Kenny. The circuit court also considered evidence that Braxton looks to Tracie and Kenny for his parental support and had done so since he was placed in their home shortly after his birth. Truax observed Braxton in Tracie and Kenny's home and noted Tracie and Kenny's commitment to Braxton's safety and welfare as his parental figures. Their home was the only home Braxton ever lived in, and Tracie and Kenny expressed their desire to adopt Braxton. Tracie and Kenny were

25

committed to fostering Braxton's relationship with his siblings and were supportive to whatever was in Braxton's best interest. Truax told the court that she did not believe that it would be detrimental to Braxton's best interest to terminate the respondent's parental rights and believed that it was in Braxton's best interest that he be made available for adoption. The court appointed guardian *ad litem* agreed with Truax's recommendations and conclusions with respect to Braxton's best interest. The guardian *ad litem* told the circuit court: "Children cannot wait for their parents to grow up and figure out what to do for them. Based on the information that we have today, Braxton's best interests lie in the termination of the [respondent's] rights so that Braxton can get on with his life ***."

¶ 67 The record before us establishes that the circuit court's finding that it was in Braxton's best interest to terminate the respondent's parental rights was not against the manifest weight of the evidence. Therefore, we affirm the court's judgment.

¶ 68                                III. CONCLUSION

¶ 69 For the foregoing reasons, we affirm the circuit court's judgment.


¶ 70 Affirmed.