*In re* TIFFANY M., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. J.M., Respondent-Appellant).

Second District   No. 2—04—0668

Opinion filed December 1, 2004.

Kathryn Bischoff, of Rockford, for appellant.

Paul A. Logli, State's Attorney, of Rockford (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, of counsel), and Kristine A. Karlin, of Mt. Prospect, for the People.

JUSTICE BYRNE delivered the opinion of the court:

Respondent, J.M., appeals an order terminating his parental rights to his daughter, Tiffany M. The trial court found J.M. to be unfit for failing to maintain a reasonable degree of interest, concern, or responsibility toward Tiffany's welfare (see 750 ILCS 50/1(D)(b) (West 2002)) and for failing to make reasonable efforts to correct the conditions that were the basis for her removal or to make reasonable progress toward her return home (see 750 ILCS 50/1(D)(m) (West 2002)). Respondent argues that the court's findings are against the

manifest weight of the evidence and that the termination of his parental rights was not in Tiffany's best interest. We affirm.

## FACTS

■ The State simultaneously petitioned to terminate the parental rights of respondent and Tiffany's mother. Respondent's appellate brief contains a 35-page recitation of the procedural history concerning only the mother, who is not a party to this appeal. It is unclear why respondent's counsel included such a long statement of mostly irrelevant facts while devoting only seven pages to legal analysis. We agree with the State that much of respondent's statement of facts does not comply with Supreme Court Rule 341(e)(6) and should be disregarded. See 210 Ill. 2d R. 341(e)(6) (appellant's brief must contain an accurate statement of facts, without argument, necessary to an understanding of the case). Accordingly, we strike the irrelevant portions of respondent's brief.

Tiffany was born on April 3, 2002, and placed in foster care two days later. Tiffany's mother had eight other children who had previously been removed from her care. The State filed a petition alleging that Tiffany was a neglected minor because she lived in an injurious environment where her mother suffered from mental health problems that prevented her from parenting. Tiffany was adjudicated a neglected minor and made a ward of the court on October 22, 2002. Respondent had been incarcerated on a drug offense but was released from jail on November 25, 2002. On December 13, 2002, respondent appeared in court as the putative father and the court ordered paternity testing, which confirmed that respondent was Tiffany's father.

Respondent appeared in court and counsel was appointed for him on April 22, 2003. The trial court ordered respondent to work with the family caseworker to cure the conditions that caused Tiffany to be taken into protective custody. The court further admonished respondent that he might face a petition to terminate his parental rights if he did not make reasonable efforts and reasonable progress within the next nine months and every nine-month period thereafter.

Respondent was not employed at the time of the April 22, 2003, hearing, but the assistant State's Attorney informed the court that respondent had submitted to a protective services assessment. Respondent's counsel told the court that respondent was on a waiting list for a criminal justice inpatient drug treatment program and was attending alcoholics anonymous (AA) and narcotics anonymous (NA) meetings. The court ordered respondent to remain drug- and alcohol-free, submit to treatment and random drug testing as recommended

by the caseworker, and sign all necessary releases of information. The court set the permanency goal of return home.

On October 21, 2003, the court conducted respondent's first six-month permanency review and reviewed respondent's service plans and progress reports. Respondent's counsel asserted that respondent had remained drug-free and had completed the customary three-month criminal justice inpatient drug treatment program. Counsel conceded that respondent left the program despite a recommendation that he remain two weeks longer. Counsel asserted that respondent obtained a sponsor and often spent time at his church, participating as the lead singer in the choir. The assistant State's Attorney argued that respondent had failed to complete the recommended treatment. Several lab reports indicated that respondent had tested positive for cocaine at least once per month from January 2003 to May 2003.

Cali Broege, a Catholic Charities evaluator assigned to the case by the Department of Children and Family Services (DCFS), rated respondent's progress as unsatisfactory because he left the treatment program prematurely after he was advised to remain there. Respondent could not complete the outpatient portion of the program because he failed to complete the inpatient portion. Moreover, respondent failed to verify his contact with his sponsor and his participation in AA/NA meetings. Respondent's home was unfit for Tiffany because respondent was living with a woman named "Goldie," an alcoholic paramour who had allegedly sexually abused children. Respondent was attempting to obtain suitable public housing at the time the report was prepared. Respondent was still unemployed, had not maintained a legal means of support, and declined Broege's offer to drive him to businesses to inquire about job openings.

The trial court changed the permanency goal from return home to substitute care pending court determination of parental rights. The court found that respondent had not made reasonable efforts or progress, because he failed to complete the recommended drug treatment program.

On November 14, 2003, the State petitioned to terminate respondent's parental rights. The court scheduled an unfitness hearing for February 25, 2004, but continued the matter because respondent failed to appear. On March 30, 2004, the court held the unfitness hearing, at which respondent testified that he missed one visit with Tiffany as well as the February 25 hearing because he was with his stepmother, who had suffered a stroke. Respondent asserted that he called Broege frequently regarding visitation and other issues. He did not submit to two drug tests, in February and March 2004, and knew that he would be charged with failing them. Respondent denied

that he intentionally skipped the tests because he knew they would be positive. Respondent completed a 90-day program in Rosecrance, a substance abuse treatment facility, but left on March 7, 2004, despite another recommendation by his treatment providers that he remain two weeks longer. Respondent was arrested on a felony drug charge in August 2003. He also stopped attending AA/NA meetings in November 2003 and failed to verify his prior participation. Respondent stated that he created a relapse prevention plan as recommended; he attended church and spent time with his sponsor and others who did not consume alcohol.

Respondent admitted that he had lived with Goldie for nine months and had learned of her problems during the previous year. Respondent was searching for new housing because he knew that his home was unsuitable for Tiffany, but he insisted that Broege told him that his unemployment would not prevent him from gaining custody of his daughter. Respondent recalled missing only two of his weekly visits with Tiffany since learning that he was her father. Respondent left Rosecrance prematurely because he believed that illegal drugs were entering the facility and would jeopardize his recovery and parenting efforts. Respondent's status as a convicted felon hindered him from obtaining a job and public housing. Respondent admitted drinking beer but insisted that he had not used cocaine for a year.

Kim Burks, a Catholic Charities caseworker, testified that she saw respondent and Goldie at a Burger King restaurant in Rockford on a date that respondent had testified to being with his ill stepmother in Chicago. Burks supervised respondent's visitation with Tiffany from January 2003 through February 2004. During the first month of visitation, respondent and Tiffany were very quiet, but Tiffany later became very comfortable with respondent. Respondent fed Tiffany the snacks and bottle that her foster parents prepared. He also handled her appropriately when she cried and gave her age-appropriate Christmas gifts. Respondent's parenting skills improved and he did not miss any visits while Burks served as his caseworker.

Broege testified that she had been providing case management services for the family since August 8, 2002, and that she had reviewed respondent's progress with the most recent service plan, which ran from March to October 2003. Broege rated respondent as unsatisfactory because he ended the substance abuse treatment portion of the plan two weeks prematurely. Moreover, his treatment providers at Rosecrance reported that he did not take responsibility for his substance abuse and had not developed a relapse recovery plan. His counselors were especially concerned because respondent had previously relapsed after a two-year period of sobriety. Although respondent

received strong support from members of his church, he failed to confirm his participation with AA/NA. Broege thought it was unusual that respondent had dropped out of contact with her during the past month.

The court continued the unfitness hearing to May 14, 2004, at which time respondent testified that he had been placed in the Winnebago County jail for failing to inform his probation officer that he was living at the Rosecrance treatment center. Respondent initially stated that he had not spoken with his probation officer since August 2002 even though he knew he was required to report monthly. Respondent subsequently indicated that he met with his probation officer in February 2003, before entering Rosecrance three months later. Respondent and his probation officer each testified that respondent was unemployed and had not completed the public service work that was a term of his probation. Finally, respondent testified that his probation requirements often conflicted with his DCFS service plan requirements and that his probation officer was unsympathetic and uncooperative.

The trial court found that respondent was unfit for failing to maintain a reasonable degree of interest, concern, or responsibility toward Tiffany's welfare (see 750 ILCS 50/1(D)(b) (West 2002)) and for failing to make reasonable efforts to correct the conditions that were the basis for her removal or to make reasonable progress toward her return home within nine months of the adjudication of neglect (see 750 ILCS 50/1(D)(m) (West 2002)). After summarizing the evidence presented, the court noted that respondent was directed to address issues of substance abuse, housing, employment, and parenting but had shown no progress in any area except parenting.

On June 10, 2004, the court conducted a best interest hearing, at which Donald Adams, a Catholic Charities caseworker, testified that he had managed Tiffany's case from the beginning. After her birth, Tiffany was released from the hospital and placed in traditional preadoptive foster care with two of her siblings, Christopher and Romeo, who were 17 and 4 years old, respectively. The foster parents had recently adopted Romeo and had expressed a desire to adopt Tiffany as well. Tiffany exhibited exceptional development, largely due to the foster mother's teaching and Tiffany's attendance at a learning center three to four times per week. Tiffany had bonded very well with both foster parents. Adams believed that respondent's incarceration would prevent him from creating comparably stable living conditions for at least two years. Moving Tiffany to another home or returning her to respondent would impede her developmental progress because she had solid relationships with her foster parents and siblings with whom she

lived. Adams had no reservations about placing Tiffany, a biracial child, with the Caucasian foster parents. Adams observed a relationship between Tiffany and respondent, but he believed that the two had not bonded.

The foster mother testified consistently with Adams, indicating that she and her husband wished to adopt Tiffany and that they had helped her bond with all of her siblings. The court took judicial notice of the record of the unfitness hearing as well as respondent's criminal file.

Respondent testified that he visited with Tiffany weekly before he was incarcerated. Respondent believed that he and Tiffany had bonded. Tiffany recognized respondent, and they would talk and play during the visits. If Tiffany became cranky, respondent could calm her. Respondent asserted that it was in Tiffany's best interest that he retain his parental rights, because he was attempting to correct the mistakes he had made in life. Respondent's other four children had already been removed from his care and adopted.

On June 16, 2004, the trial court found by a preponderance of the evidence that it was in Tiffany's best interest to terminate respondent's parental rights, and the court granted DCFS the power to consent to her adoption. The court noted that Tiffany had bonded with the foster parents and had developed a lesser relationship with respondent. Tiffany had developed relationships with all of her siblings while living in the foster home, and the foster parents proved to be very nurturing caregivers. The court admonished respondent of his appeal rights, and this timely appeal followed.

## ANALYSIS

### 1. Finding of Unfitness.

Respondent contends that the trial court's finding of unfitness is against the manifest weight of the evidence and that the court erred in terminating his rights. The Juvenile Court Act of 1987 (the Juvenile Court Act) provides a two-stage process for terminating parental rights involuntarily. 705 ILCS 405/2—29(2) (West 2002). The State must first prove parental unfitness by clear and convincing evidence and then show that the child's best interests are served by severing parental rights. *In re Adoption of Syck*, 138 Ill. 2d 255, 277 (1990). Section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2002)) lists various grounds under which a parent may be found unfit, any of which standing alone may support such a finding. See *In re D.F.*, 332 Ill. App. 3d 112, 117, 125 (2002).

A determination of parental unfitness involves factual findings and credibility assessments that the trial court is in the best position

to make. *In re A.B.*, 308 Ill. App. 3d 227, 240 (1999). We defer to the trial court's factual findings and will not reverse the court's decision unless the findings are against the manifest weight of the evidence. See *A.B.*, 308 Ill. App. 3d at 240. A factual finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the determination is unreasonable, arbitrary, and not based on the evidence. *A.B.*, 308 Ill. App. 3d at 240. Because parents have superior rights against all others to raise their children, the State must prove by clear and convincing evidence at least one ground of parental unfitness under section 1(D) of the Adoption Act before the trial court may terminate parental rights. *A.B.*, 308 Ill. App. 3d at 240.

■ Section 1(D)(m) of the Adoption Act contains three separate grounds, any one of which may be the basis for a finding of parental unfitness. Subsection (i) deals with a parent's failure to make "reasonable efforts" to correct the conditions that were the basis for the removal of the child; subsection (ii) deals with a parent's failure to make "reasonable progress" toward the return of the child within nine months after an adjudication of neglect; and subsection (iii) deals with a parent's failure to make "reasonable progress" toward the return of the child during "any nine month period" after the end of the initial nine-month period following the adjudication of neglect. See 750 ILCS 50/1(D)(m) (West 2002). The nine-month periods that apply to each subsection are as follows: subsections (i) and (ii) are to be examined in light of only the first nine months after the adjudication of neglect, and subsection (iii) may be examined in light of any nine-month period following the expiration of the first nine months after the adjudication of neglect. See *In re D.F.*, 332 Ill. App. 3d 112, 118-20 (2002); 750 ILCS 50/1(D)(m) (West 2002).

Tiffany was adjudicated neglected on October 22, 2002, but respondent was not involved in the case until six months later, when the first service plan was issued on April 22, 2003. The State contends that it proved respondent unfit for his failure to make reasonable efforts to correct the conditions that led to Tiffany's removal or to make reasonable progress toward her return within nine months of the adjudication of neglect. See 750 ILCS 50/1(D)(m)(i), (D)(m)(ii) (West 2002).

■ Respondent testified that he attempted to comply with the initial service plan. However, the State's witnesses stated that respondent failed to complete any of the recommended substance abuse treatment. Respondent tested positive for cocaine at least once per month from January to May 2003, he was unemployed and did not obtain a lawful means of support as directed, and he continued to

reside with a woman who was struggling with her own substance abuse issues. Based on this overwhelming evidence, the trial court found that respondent made neither reasonable efforts nor reasonable progress toward creating a suitable environment for Tiffany, and we conclude that the trial court's finding of respondent's unfitness based on section 1(D)(m) of the Adoption Act was not against the manifest weight of the evidence.

When parental rights are terminated based upon clear and convincing evidence of a single ground of unfitness, the reviewing court need not consider additional grounds for unfitness cited by the trial court. See *In re D.D.*, 196 Ill. 2d 405, 422 (2001). Therefore, this court need not consider whether respondent was unfit based upon the trial court's findings that he failed to maintain a reasonable degree of interest, concern, or responsibility toward Tiffany (see 750 ILCS 50/ 1(D)(b) (West 2002)).

## 2. Best Interest Determination.

Finally, we review the trial court's finding that the termination of respondent's parental rights was in Tiffany's best interest. Once a trial court finds a parent unfit under one of the grounds of section 1(D) of the Adoption Act, the court must consider whether it is in the best interests of the child to terminate parental rights pursuant to the Juvenile Court Act (705 ILCS 405/1—3 (West 2002)). *In re Jaron Z.*, 348 Ill. App. 3d 239, 261 (2004). Our supreme court has recently eliminated any doubt as to what standard of proof applies to a best interest hearing in the trial court: the State must prove by a preponderance of the evidence that termination is in the child's best interests. *In re D.T.*, 212 Ill. 2d 347, 366 (2004); see also *Jaron Z.*, 348 Ill. App. 3d at 261.

However, much confusion remains as to what standard of review applies on appeal. Certain divisions of the First District Appellate Court, for example, have reviewed trial courts' best interest determinations under the abuse of discretion standard (see *In re E.C.*, 337 Ill. App. 3d 391, 401 (2003); *In re D.L.*, 326 Ill. App. 3d 262, 270-71 (2001); *In re D.H.*, 323 Ill. App. 3d 1, 13 (2001); *In re Jason U.*, 214 Ill. App. 3d 545, 550 (1991)), while other divisions of the same court have elected to review the issue under the manifest weight of the evidence standard (see *In re Gwynne P.*, 346 Ill. App. 3d 584, 599 (2004); *In re J.B.*, 346 Ill. App. 3d 77, 82 (2004); *In re C.M.*, 319 Ill. App. 3d 344, 360 (2001); *In re Sheltanya S.*, 309 Ill. App. 3d 941, 955 (1999)). Recently, one panel of the First District avoided the issue entirely, concluding that the trial court's decision to terminate the parent's rights was proper under either standard (see *In re Dominique W.*, 347

Ill. App. 3d 557, 569 (2004)); and another panel determined that a trial court's decision at this stage of the proceedings will not be disturbed unless it is contrary to the manifest weight of the evidence, because that standard necessarily encompasses abuse of discretion (see *In re G.L.*, 329 Ill. App. 3d 18, 25 (2002)). This court has recently applied the manifest weight of the evidence standard of review (*In re K.H.*, 346 Ill. App. 3d 443, 462-63 (2004)), while acknowledging that the rule is not well settled in this state (*K.H.*, 346 Ill. App. 3d at 479 (Gilleran Johnson, J., dissenting)).

Without setting forth a holding on the issue, our supreme court recently commented on the *likelihood* that a particular standard of review applies to a best interest determination:

" 'Abuse of discretion' is the most deferential standard of review—next to no review at all—and is therefore traditionally reserved for decisions made by a trial judge in overseeing his or her courtroom or in maintaining the progress of a trial. *** Accordingly, a trial judge's *evidentiary* rulings during a best-interests hearing are subject to an abuse of discretion standard of review. [Citations.] But a trial judge's ruling on the *ultimate issue* at a best-interests hearing—whether the parent-child relationship should be permanently and completely severed—is plainly not the type of ruling to which the highly deferential abuse of discretion review traditionally applies." (Emphasis added.) *D.T.*, 212 Ill. 2d at 356-57.

■ Although the supreme court did not expressly hold that the abuse of discretion standard does not apply to a trial court's ultimate determination to terminate a parent's rights, the clear implication of *D.T.* is that the abuse of discretion standard applies only to a review of evidentiary issues, while the manifest weight of the evidence standard applies to a review of the ultimate determination to terminate parental rights. Because no evidentiary issues are raised regarding the best interest hearing in this case, we next turn to the trial court's ultimate decision to terminate respondent's parental rights, and we review that decision under the manifest weight of the evidence standard.

■ In the context of a best interest determination, section 1—3(4.05) of the Juvenile Court Act sets forth a number of factors to consider within "the context of the child's age and developmental needs." 705 ILCS 405/1—3(4.05) (West 2002). The factors include the following:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued ***;

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1—3(4.05) (West 2002).

A court may also consider the nature and length of the child's relationship with his present caretaker and the effect that a change in placement would have upon his emotional and psychological well-being. *Jaron Z.*, 348 Ill. App. 3d at 262. However, the trial court need not articulate any specific rationale for its decision, and a reviewing court may affirm the trial court's decision without relying on any basis used by the trial court. *Jaron Z.*, 348 Ill. App. 3d at 263.

■ The undisputed evidence indicates that Tiffany has lived with the foster parents and two of her siblings since birth and considered them her family. The foster mother testified that she and her husband wished to adopt Tiffany, and the trial court concluded that the foster parents were excellent, nurturing caregivers. Adams, a Catholic Charities caseworker, testified that Tiffany's exceptional development would be least affected by remaining in the foster home. The foster parents placed Tiffany in an education program at a learning center and insured that she developed relationships with siblings with whom she was not residing. Finally, Adams noted that respondent would likely be unable to provide a suitable environment for Tiffany within the next two years. Our review of the evidence and the trial court's findings indicates that the court's decision to terminate respondent's parental rights was not against the manifest weight of the evidence.

For the preceding reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

KAPALA and GILLERAN JOHNSON, JJ., concur.