NOTICE
Decision filed 11/07/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 220446-U

NO. 5-22-0446

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* M.S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 20-JA-90 |
| | ) | |
| Robert S., | ) | Honorable |
| | ) | Brett N. Olmstead, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Justices Welch and Vaughan concurred in the judgment.

**ORDER**

¶ 1   *Held*: The circuit court's findings that respondent father was an unfit parent and that termination of his parental rights was in the minor's best interest were not against the manifest weight of the evidence.

¶ 2   Respondent, Robert S., appeals from the judgment of the circuit court of Champaign County terminating his parental rights to his biological minor child, M.S. On appeal, Robert S. argues that the court's findings that he was an unfit parent and that it was in M.S.'s best interest to terminate his parental rights were against the manifest weight of the evidence. For the following reasons, we affirm the judgment of the circuit court.

1

¶ 3                                    I. Background

¶ 4      Robert S. and Heather O.[1] had one child, M.S., born on September 7, 2020. The Illinois Department of Children and Family Services (DCFS) took protective custody of M.S. on September 21, 2020.

¶ 5      On September 22, 2020, the State filed a petition for adjudication of neglect, alleging that M.S. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2020)), because M.S. was in an injurious environment when she resided with Heather O. and/or Robert S. in that the environment exposed M.S. to substance abuse.

¶ 6      Also, on September 22, 2020, DCFS filed a shelter care report, which indicated that DCFS received a hotline call regarding M.S. on September 15, 2020. The caller reported that M.S. experienced prematurity complications and withdrawal symptoms after birth due to in utero exposure to drugs of dependence. The report indicated that Heather O. tested positive for opiates and cannabis at the time of M.S.'s birth. The report further indicated that Heather O., who suffered from a heart infection due to intravenous drug usage, tested positive for opiates and benzodiazepine when admitted to the hospital shortly before M.S.'s birth. Hospital officials did not prescribe the substances to Heather O. and suspected that Robert S. brought the substances into the hospital for Heather O. Robert S. admitted during an interview on September 21, 2020, that he sporadically used heroin, and that he last used heroin the day prior. The report indicated that Robert S. and Heather O. resided together with Heather O.'s mother, who suffered from dementia.

_____

[1]Although Heather O.'s parental rights were also terminated, she was not a party to this appeal. Accordingly, we limit our recitation of the facts to those relevant to our disposition of the instant appeal.

¶ 7 Prior to the shelter care hearing on September 22, 2020, the circuit court entered an order appointing a guardian *ad litem* (GAL) for M.S. Heather O. did not appear at the hearing, but Robert S. appeared with court appointed counsel. Following the hearing, the court entered a temporary custody order, placing temporary custody of M.S. with DCFS.

¶ 8 On November 2, 2020, DCFS prepared a family service plan, which indicated that the case opened due to concerns of substance abuse by both parents. The service plan required Robert S. and Heather O. to cooperate with DCFS and the Center for Youth and Family Solutions (CYFS) in order to successfully complete all recommended services. The service plan required both parents to perform the following tasks: complete parenting classes; complete domestic violence classes; complete a substance abuse assessment; follow all recommendations and treatment plans from the substance abuse assessment; present for random drug screens; engage in individual counseling; follow all recommendations and treatment plans from individual counseling; and participate in weekly supervised visitation with M.S.

¶ 9 On January 7, 2021, the State filed a first amended petition for adjudication of neglect, which alleged two counts. In count I, the State again alleged that M.S. was neglected because she was in an injurious environment when she resided with Heather O. and/or Robert S. in that the environment exposed M.S. to substance abuse. In count II, the State alleged that M.S. was neglected when she resided with Heather O. in that M.S. had a medical diagnosis at birth of withdrawal symptoms from narcotics or barbiturates.

¶ 10 The matter proceeded to an adjudicatory hearing, which began on January 7, 2021, and concluded on January 22, 2021. At the hearing, both parents admitted and stipulated to the State's allegation of neglect in count I, for which the circuit court found a factual basis in the shelter care report. The court entered an adjudicatory order on January 22, 2021, dismissing count II of the

petition and finding that the State proved, by a preponderance of the evidence, the allegations in count I of the petition.

¶ 11 On February 9, 2021, DCFS filed a dispositional hearing report, which was prepared by CYFS caseworker Jamie Buskirk. Buskirk noted in the report that Robert S. and Heather O. continued to reside together with Heather O.'s mother in a two-bedroom duplex, and that Robert S. received monthly disability benefits in the amount of $800. Buskirk indicated that both parents were in the process of beginning the classes and counseling recommended in the family service plan. Buskirk noted that both parents completed a substance abuse screen on November 18, 2020, and that she referred both parents to Rosecrance to complete a substance abuse assessment. Buskirk noted that Robert S. voluntarily completed the assessment in October 2020, prior to the substance abuse screen. Buskirk noted that Rosecrance recommended intensive outpatient treatment for Robert S., and that she completed a referral for Robert S. on January 1, 2021. Buskirk also noted that CYFS placed Robert S. and Heather O. on a drug screen calendar and call-in system beginning on October 6, 2020, and November 4, 2020, respectively. Buskirk indicated that both parents failed to appear for the majority of their scheduled drug screens, and that both parents tested positive for various substances on dates they appeared for drug screens. Buskirk indicated that both parents presented for weekly supervised visits with M.S., and that both parents occasionally fell asleep during the visits. Buskirk additionally noted that M.S. resided in substitute care with a paternal relative, and that M.S. appeared "very bonded and comfortable with her caregiver."

¶ 12 On February 17, 2021, the circuit court held a dispositional hearing. On February 18, 2021, the court entered a dispositional order, adjudicating M.S. neglected and making her a ward of the court. The court placed M.S. in the custody and guardianship of DCFS.

4

¶ 13   On May 27, 2021, DCFS filed a permanency hearing report, which was prepared by CYFS caseworker Lasiema Burton and approved by case supervisor Natasha Mables. Burton noted that both parents were currently engaged in all recommended services, aside from domestic violence counseling. Burton also noted that both parents engaged in weekly visitation with M.S., and that both parents remained awake during recent visits. Burton noted, however, that both parents failed to appear for multiple drug screens and that both parents tested positive for various substances on multiple occasions from February to May 2021. Specifically, Burton noted that Robert S. missed two drug screens in May 2021 due to a "[m]ix up with CYFS front desk," and tested positive for methadone on May 14, 2021. Robert S. reported that he recently signed up to receive methadone treatment through Recovery Concepts. Burton indicated that neither parent fully corrected the conditions which brought M.S. into care, and that both parents needed to continue the recommended services. Burton recommended a permanency goal of return home within 12 months.

¶ 14   On June 3, 2021, the circuit court held a permanency hearing. Following the hearing, the court entered a permanency order, finding that neither parent made reasonable and substantial progress or reasonable efforts toward returning M.S. home. The court ordered both parents to continue to engage in the recommended services and to maintain sobriety. The court set a permanency goal of return home in 12 months.

¶ 15   On August 30, 2021, CYFS caseworker Ashley Kerns, in coordination with DCFS, prepared a family service plan, which summarized the progress of Robert S. and Heather O. Kerns indicated in the service plan that both parents continued to engage in the recommended services, aside from domestic violence counseling. Kerns noted that both parents planned to begin domestic violence counseling after they completed their current services. Kerns noted that both parents

participated in parenting classes and appeared for weekly supervised visits with M.S. without issue. Accordingly, Kerns rated the progress of both parents on the recommended parenting classes and visitation as satisfactory. However, Kerns indicated that both parents inconsistently attended substance abuse and individual counseling. Kerns further indicated that both parents missed multiple drug screens and continued "to struggle with substances" at that time. Thus, Kerns rated both parents' overall progress as unsatisfactory.

¶ 16    On September 23, 2021, DCFS filed a permanency hearing report, which was prepared by Kerns. Kerns indicated in the report that both parents made reasonable efforts towards the goal of return home but that threats continued to exist. Kerns noted that Robert S. and Heather O. completed the recommended parenting classes in September 2021, and that both parents planned to begin the previously recommended domestic violence classes. Kerns noted that both parents attended weekly supervised visitation with M.S. without issue. Both parents also continued to engage in substance abuse and individual counseling, but their attendance remained inconsistent. Kerns additionally noted that both parents failed to appear for seven drug screens, and that both parents tested positive for multiple substances from June 7, 2021, to September 8, 2021. With regard to Robert S., Kerns noted that he tested positive for methadone at each drug screen but indicated that methadone was prescribed to him as treatment. Robert S. also tested positive for alcohol on June 16, 2021, July 6, 2021, July 8, 2021, and August 25, 2021. Robert S. additionally tested positive for alcohol and tetrahydrocannabinol (THC) on August 5, 2021, August 31, 2021, September 3, 2021, and September 8, 2021. Kerns recommended that the permanency goal remain return home in 12 months.

¶ 17    On September 30, 2021, the circuit court held a permanency hearing. Following the hearing, the court entered a permanency order, finding that both parents made reasonable efforts

toward returning M.S. home but that neither parent made reasonable and substantial progress toward returning M.S. home. The court ordered both parents to consistently engage in services and maintain sobriety. The court ordered that the permanency goal remain return home within 12 months.

¶ 18    On January 13, 2022, DCFS filed a permanency hearing report, which was prepared by Kerns. Kerns indicated that both parents made reasonable efforts towards the return home goal but that neither parent made satisfactory progress on their respective service plan tasks. Kerns noted that both parents were engaged in the recommended services but continued to abuse substances. Kerns noted that Robert S. continued to test positive for THC, alcohol, and methadone. Specifically, Robert S.'s drug screen results revealed the following: a positive screen for THC and methadone on October 4, 2021; a positive screen for alcohol, methadone, and THC on October 12, 2021; failure to appear due to incarceration on October 22, 2021, and October 28, 2021; positive screens for methadone and THC on November 11, 2021, and November 16, 2021; failure to appear on November 24, 2021, December 2, 2021 due to quarantine, December 6, 2021 due to quarantine, and December 17, 2021; a positive screen for alcohol, methadone, and THC on December 22, 2021; failure to appear due to a mistake by caseworker on December 27, 2021; and a positive screen for alcohol, methadone, and THC on December 28, 2021. Kerns recommended a permanency goal of return home within 12 months.

¶ 19    Kerns attached to the permanency report a family service plan she prepared on January 4, 2022. The service plan indicated that both parents completed the recommended parenting classes and continued weekly supervised visitation with M.S. without issue. Accordingly, both parents received satisfactory ratings for the recommended parenting classes and visitation. Kerns noted

that Robert S. began domestic violence services and was scheduled to begin "the CHANGE program" but had not yet received a start date. Kerns included the following evaluation narrative:

"[Heather O.] and [Robert S.] continue to struggle with substances. [Heather O.] and [Robert S.] are engaging in substance abuse services at this time. [Robert S.] and [Heather O.] are in Domestic [*sic*] violence services, but had a domestic violence incident on 10/19/2021 that resulted in [Robert S.] getting arrested. Domestic violence services are not completed, individual counseling is inconsistent, and substance abuse service is inconsistent as well."

Thus, Kerns rated the overall progress of both parents as unsatisfactory.

¶ 20    On January 20, 2022, following a hearing, the circuit court entered a permanency order. The court found that neither parent made reasonable and substantial progress or reasonable efforts toward returning M.S. home. The court ordered both parents to consistently engage in services and maintain sobriety. The court ordered that the permanency goal remain return home within 12 months.

¶ 21    On February 15, 2022, the State filed a motion to terminate parental rights. The State alleged that both parents were unfit, as defined in section 1(D)(m)(i) of the Adoption Act (750 ILCS 50/1(D)(m)(i) (West 2020)), in that they failed to make reasonable efforts to correct the conditions that were the basis for M.S.'s removal during any nine-month period after the adjudication of neglect. The State also alleged that both parents were unfit, as defined in section 1(D)(m)(ii) of the Adoption Act (*id*. § 1(D)(m)(ii)), in that they failed to make reasonable progress toward M.S.'s return during any nine-month period after the adjudication of neglect. The State identified the relevant nine-month period for both allegations as the time period from May 15, 2021, to February 15, 2022.

8

¶ 22    On February 16, 2022, the circuit court addressed the motion to terminate at a hearing, where both parents were present with counsel. In a docket entry,[2] the court noted, "Motion seeking finding of unfitness and termination of parental rights to be filed. Admonitions heard. Court finds the respondent parents understand the same."

¶ 23    On April 22, 2022, the circuit court held a fitness hearing. The State called Ashley Kerns to testify at the hearing. Kerns testified that she became involved in the case in July 2021, and she took over the case in August 2021. At all relevant times, Robert S. and Heather O. resided with Heather O.'s mother in a two-bedroom duplex. Neither Heather O. nor Robert S. were employed, but Robert S. received monthly disability payments. Kerns did not find the duplex appropriate for M.S. because "[t]hey didn't have a room for [M.S.] or a crib or necessary bottles or toys for [M.S.]" Kerns also expressed concerns about Robert S. and Heather O. residing together. Specifically, Kerns was concerned of a potential domestic violence situation and believed the two were in an "unhealthy, controlling relationship." Kerns explained that Robert S. exhibited signs of control over Heather O. in that he controlled all communications with CYFS and DCFS. Kerns conducted separate visits with Robert S. and Heather O. following a domestic violence incident in October 2021. Robert S. and Heather O. both claimed that the incident resulted from a misunderstanding with a neighbor. Kerns never considered allowing Robert S. and Heather O. unsupervised visitation with M.S. due to their substance abuse issues.

¶ 24    Kerns next testified regarding Robert S.'s progress on the tasks set forth in the family service plan. Robert S. finished parenting classes in September 2021 but had not begun domestic violence classes as of February 15, 2022. Robert S. attended individual counseling at CYFS, but his attendance was inconsistent. Robert S. indicated to Kerns that he understood it was important

_____

[2]A transcript of the proceedings was not included in the record on appeal.

to maintain sobriety but continued to use substances throughout the case. When asked to specify the substances Robert S. used, Kerns responded, "Alcohol and THC." Kerns never considered placing M.S. in Robert S.'s care due to his substance use, his history of domestic violence, and his failure to complete the necessary services. Kerns explained that both parents tested positive for THC and alcohol on days when they had supervised visits with M.S. When Kerns confronted Robert S. about the test results, Robert S. became defensive. Robert S. advised Kerns that he knew parents who used alcohol and THC but were still good parents.

¶ 25    On cross-examination, Kerns admitted that Robert S. consistently engaged in supervised visitation with M.S. throughout her involvement in the case. Kerns agreed that the visits "were good."

¶ 26    The circuit court admitted the family service plan, dated August 30, 2021, into evidence at the hearing over the objection of Robert S. and Heather O.'s respective counsels. Thereafter, the State moved to continue the hearing for the testimony of a witness who failed to appear at the hearing. The court granted the State's motion.

¶ 27    On May 11, 2022, the fitness hearing resumed. At the outset of the hearing, Robert S. made an oral motion for the appointment of new counsel, which the circuit court denied. The State called case supervisor Natasha Mables to testify at the hearing. Mables testified that she supervised M.S.'s case from April 2021 to March 2022. During that time, Robert S. and Heather O. resided together and both parents were actively engaged in the recommended services. Robert S. was actively engaged in substance abuse treatment, but Mables noted ongoing concerns about Robert S. "being forthcoming about his substance use" during her involvement in the case. Mables discussed the results of Robert S.'s drug screens with him, and he acknowledged his continued use of alcohol. Mables reminded Robert S. that he needed to refrain from substance use throughout

10

the case. Robert S. indicated that he understood, but Mables never saw a change in Robert S. Mables further noted that Robert S. did not consistently attend individual counseling sessions. Robert S. advised Mables that he had difficulty attending counseling because Heather O. was unable to travel by bus due to health issues. Mables noted, however, that Robert S.'s counseling sessions were separate from Heather O.'s sessions and, thus, he could have attended the sessions without Heather O. Robert S. advised Mables that he planned to complete the domestic violence courses after he finished his other services. Mables reported that Robert S. consistently attended visitation with M.S. Mables noted that Robert S. fell asleep during the initial visits, but that Robert S. corrected the issue. Mables expressed concerns about the relationship between Robert S. and Heather O., explaining that the two were "very codependent and there might have been some overreliance on each other."

¶ 28　Next, Robert S. testified on his own behalf. Robert S. explained that the caseworker provided him with a bus pass to assist with transportation to and from the recommended services. Robert S. claimed that he attended counseling regularly but there were times his assigned counselor was unavailable. Robert S. testified that he completed the recommended parenting courses in September 2021, and that he regularly attended visitation with M.S. Robert S. explained that the visits with M.S. went well and that he occasionally fell asleep because he took methadone to "get off the heroin." Robert S. planned to begin domestic violence counseling after he completed the other services. Robert S. claimed that his "whole week was always full" due to the parenting courses, individual counseling sessions, and substance abuse counseling sessions. He explained that both he and Heather O. suffered from medical issues and that they both missed medical appointments due to the scheduled courses and counseling sessions.

¶ 29    After considering the parties' closing arguments, the circuit court found the State proved, by clear and convincing evidence, that both parents were unfit. In doing so, the court stated as follows:

"The problem was from the very beginning substance abuse by both of these parents. It—for each of them that was the problem. Each of these parents, [Heather O.], [Robert S.], substance abuse, and it was affecting their home environment, affected the environment that they could provide for M.S.

They were involved, as I said, in parenting. They finished those. They were involved in individual counseling though their attendance was inconsistent. They were involved for periods of time in substance abuse treatment but inconstantly with that, too, and the screens were consistently a problem that was discussed with them by two different caseworkers.

Visits they attended regularly, regularly and consistently. I've heard testimony about [Robert S.] nodding off during visits. The explanation he's given is because of medication, specifically methadone, that was part of a substance abuse treatment protocol for him that was helping with his heroin addiction which that—that whole process and his participation in that substance assisted—or, medication assisted treatment I don't think any of that informs the decision of the Court here today because that wasn't the substance or substances that were creating the problem during this nine-month period.

The substances that were creating the problem during this nine-month period were alcohol and THC, and the count to which both of these parents stipulated back at the time of adjudication was about substance abuse affecting the home environment and the substances we're talking about were alcohol and THC. And what happened—and again I

don't mean to lump the parents together. As I said, the State has the burden for each of these parents, but their situation and the way they approached that problem was inextricably intertwined. They remained together in this relationship and they remained together in their relationship with alcohol and their relationship with THC, and that relationship continued throughout that nine-month period and what they both did was engage in every services as they could trying to overcome the logistical difficulties that they had while consistently maintaining their relationship with alcohol and THC.

They completed the parenting because the parenting had no pressure to quit. They were engaged in the individual counseling inconsistently because there wasn't pressure there to quit, either. They were engaged inconsistently in substance abuse treatment because there is pressure there to quit and they were not about that. The screens were consistently a problem that was discussed with them and they alternated between—and this as for both of them. They alternated between recognizing there's a problem and they need to quit and then alternately not recognizing that it was a problem at all.

There were times that they said—this comes from the testimony of Ms. Kerns. There were times they said they needed to be sober. There were times that they said they didn't understand why they would have to be sober, stop using alcohol, THC, because they didn't understand how that affected their parenting skills. To them they could continue to parent even though they continued to drink and use THC in whatever manner they chose.

[Robert S.] said to Ms. Kerns that he knew parents who used substances and they're still good parents. He didn't understand how that's the problem. That was the problem. That was the problem from the get-go of this case, and it—I would submit that the evidence shows one specific fact in how that problem's reflected.

13

> They—both of these parents established a life for themselves where they made room for alcohol, consistent constant alcohol use. They both made room for THC, consistent constant THC use. They made zero room in their life for [M.S.] Zero."

The court went on to state that, although visitation with M.S. went well, both parents came to visits "completely unprepared with anything." The court noted that the foster parent brought all necessary supplies for the visit. The court also stated as follows:

> "Their home had no place for [M.S.] No room, no crib, no diapers. None of that was there for [M.S.] They were never in a position to do that because they didn't have room in their life for [M.S.] That room was being taken up by something else, alcohol and THC, and they never made sincere concerted effort to address that problem and achieve a point where they could maintain sobriety. They established for themselves a role, and the role wasn't somebody who could be full-time parent. The role was somebody who could be part of [M.S.'s] life and have occasional contact with M.S. but could never be in a position to be the person who's full-time responsible for the safekeeping and caregiving for this very young child.

> That is lack of reasonable efforts. That is lack of reasonable progress. The State has proven by clear and convincing evidence both of the counts of the motion as to each of the Respondent Parents."

¶ 30 On June 6, 2022, Kerns filed a best interest report, which included her recommendation that both parents' parental rights to M.S. be terminated. In addition to noting that both Robert S. and Heather O. failed to prove their abilities to safely parent M.S. due to their continued substance abuse throughout the case, Kerns summarized M.S.'s current foster placement with a relative as follows:

14

"[M.S.] continues to do well in her foster placement with her paternal cousin. [M.S.] appears to be very bonded with foster parent. There have been no concerns with [M.S.] at her foster placement. Foster parent has proved to be able to provide [M.S.] with a loving and caring environment. Foster parent has expressed wanting to adopt [M.S.] in order to achieve permanency. [M.S.] has had all her needs met while in the foster home. [M.S.] has her own room, bed, and toys at her foster home. Foster parent has shown her commitment to [M.S.] and is willing to adopt [M.S.]"

¶ 31    On June 30, 2022, the circuit court held a best interest hearing. At the outset of the hearing, the court reviewed the results of drug screens completed by the parents on May 12, 2022. The court noted that Heather O. tested positive for alcohol and THC. The court also noted that Robert S. tested positive for cocaine, THC, and alcohol. The GAL recommended that the court find it in the best interest of M.S. that the parental rights of Heather O. and Robert S. be terminated. Robert S.'s counsel requested that the court find it was not in the best interest of M.S. to terminate Robert S.'s parental rights, arguing that Robert S. maintained visitation with M.S. and devotion to her.

¶ 32    The circuit court initially explained that the best interest hearing focused on M.S., not the conduct of Robert S. and Heather O. The circuit court next reviewed the statutory best interest factors, beginning with the physical safety and welfare of the child. The court noted that it was clear throughout the case that neither parent was in a position to provide for M.S., and that there was "no point visible on the horizon where they'd be able to do that." While both parents appeared to reside in a stable residence, the court noted that both parents were active substance abusers, "who [had] not been able to find what they need to start out on a path to recovery." The court acknowledged that both parents regularly attended visitation with M.S. and expressed a desire to be involved in M.S.'s life but noted that neither parent was ever in a position to exercise "24-hour-

15

a-day, seven-day-a-week care of this very young child." In other words, the court found that neither parent was in a position to provide for M.S.'s physical welfare or safety on an ongoing basis. The court went on to state that it did not focus only on the parents' ability to provide for M.S.'s safety and welfare but focused on other factors as well.

¶ 33    With regard to the development of the child's identity, the circuit court noted that M.S. was placed in a foster home shortly after birth and remained in the same foster home at the time of the hearing. As such, the court determined that the foster home was the place where M.S. grew up and developed her identity. The court also noted that M.S.'s current home was consistent with her culture and background because she was placed with a relative. The court additionally noted that M.S. developed bonds and attachments with her foster family, stating that it was "the only home she's ever known." The court found that removing M.S. from her current home would cause disruption because her current placement provided her a sense of security, familiarity, and continuity of affection. The court further noted that M.S. currently attended Little Legends Learning Center and developed ties there. The court did not place great weight on M.S.'s wishes and long-term goals, given her young age. The court found that M.S.'s best chance for permanence, including the need for stability and continuity of relationships, was in her current foster placement.

¶ 34    After considering the factors, the court found that the State proved, by a preponderance of the evidence and by clear and convincing evidence, that it was in the best interest of M.S. that the parental rights of Heather O. and Robert S. be terminated. Robert S. timely appealed.

¶ 35                                    II. Analysis

¶ 36    On appeal, Robert S. challenges the circuit court's judgment terminating his parental rights to M.S., arguing that the court erred by finding him an unfit parent and by finding it in the best interest of M.S. to terminate his parental rights. For the reasons that follow, we disagree.

16

¶ 37    "[T]ermination of parental rights is an extraordinarily serious matter." *In re M.F.*, 304 Ill. App. 3d 236, 238 (1999). "The termination of parental rights constitutes a permanent and complete severance of the parent-child relationship." *In re C.N.*, 196 Ill. 2d 181, 208 (2001). The Juvenile Court Act establishes a two-step process for the involuntary termination of parental rights. See 705 ILCS 405/2-29(2) (West 2020). First, the State must prove, by clear and convincing evidence, that the parent is an unfit person as defined by section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *In re Tiffany M.*, 353 Ill. App. 3d 883, 889 (2004). Section 1(D) sets forth multiple grounds "under which a parent may be found unfit, any of which standing alone may support" a finding of unfitness. *Id.* If the circuit court finds the parent unfit under one of the enumerated grounds, the court must then determine whether it is the child's best interest that parental rights be terminated. 705 ILCS 405/2-29(2) (West 2020). With this in mind, we consider the specific arguments made by Robert S. on appeal.

¶ 38    A. Parental Unfitness

¶ 39    Robert S. first argues that the circuit court's determination that he was an unfit parent was against the manifest weight of the evidence. Specifically, Robert S. argues that the court's findings were against the manifest weight of the evidence, where the court determined that he failed (1) to make reasonable efforts to correct the conditions that were the basis for the removal of M.S. during the period from May 15, 2021, to February 15, 2022 (750 ILCS 50/1(D)(m)(i) (West 2020)), and (2) to make reasonable progress toward M.S.'s return during the time period from May 15, 2021, to February 15, 2022 (*id.* § 1(D)(m)(ii)). We disagree.

¶ 40    As noted, in the first step, the State must prove, by clear and convincing evidence, that the parent is unfit as defined in section 1(D) of the Adoption Act (*id.* § 1(D)). 705 ILCS 405/2-29(2), (4) (West 2020). Section 1(D) of the Adoption Act sets forth multiple grounds for unfitness.

17

750 ILCS 50/1(D) (West 2020). A finding of parental unfitness will not be disturbed unless it is against the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d 985, 998 (2004). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the determination is unreasonable, arbitrary, or not based on the evidence presented. *In re D.F.*, 201 Ill. 2d 476, 498 (2002).

¶ 41 In the present case, the circuit court found that the State successfully proved two grounds of unfitness against Robert S. While Robert S. first challenges the court's finding that he failed to make reasonable efforts, we begin by considering the court's finding that Robert S. failed to make reasonable progress. See *Tiffany M.*, 353 Ill. App. 3d at 891 ("When parental rights are terminated based upon clear and convincing evidence of a single ground of unfitness, the reviewing court need not consider additional grounds for unfitness cited by the trial court."). Specifically, we consider whether the court's finding that Robert S. failed to make reasonable progress toward the return of M.S. during the time period from May 15, 2021, to February 15, 2022, was against the manifest weight of the evidence.

¶ 42 One ground of unfitness is the failure by a parent "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act." 750 ILCS 50/1(D)(m)(ii) (West 2020). "Reasonable progress is an objective standard, focusing on the amount of progress toward the goal of reunification one can reasonably expect under the circumstances." (Emphasis omitted.) *In re C.M.*, 305 Ill. App. 3d 154, 164 (1999). Reasonable progress requires, at a minimum, measurable or demonstrable movement toward the goal of reunification. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. "Reasonable

18

progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006).

¶ 43    Although DCFS service plans are an integral part of the statutory scheme, our supreme court has rejected the view that the sole measurement of parental progress is the parent's compliance with service plans. *In re C.N.*, 196 Ill. 2d at 214-15. Instead, the supreme court ruled that:

> "[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *Id*. at 216-17.

Moreover, the Fourth District has repeatedly stated that "a court is duty bound to ensure that serious parental deficiencies of whatever nature have been corrected before the court permits one of its wards to be returned to that parent's custody." *In re L.L.S.*, 218 Ill. App. 3d 444, 464 (1991); *C.M.*, 305 Ill. App. 3d at 164; *In re C.S.*, 294 Ill. App. 3d 780, 790 (1998).

¶ 44    Here, the evidence demonstrated that the condition which gave rise to the removal of M.S. was both parents' substance abuse issues. The testimony of Kerns, coupled with the family service plan, demonstrated that Robert S. was required to perform the following service plan tasks: cooperate with CYFS and DCFS; complete parenting classes; complete domestic violence counseling; engage in weekly visitation with M.S.; complete individual counseling, along with any other recommended treatment; complete substance abuse counseling, along with any other recommended treatment; and complete random drug screens. The evidence showed that Robert S. cooperated with CYFS and DCFS, successfully completed the parenting classes in September

19

2021, and engaged in weekly supervised visitation with M.S. without issue. The evidence also showed that Robert S. engaged in individual and substance abuse counseling but that his attendance was inconsistent from May 2021 to February 2022. The evidence additionally showed that Robert S. tested positive for alcohol and THC on multiple occasions from May 2021 to February 2022. In addition, Robert S. missed multiple drug screens from May 2021 to February 2022. Thus, although Robert S. complied with certain aspects of the service plan, he inconsistently attended substance abuse counseling and continued to test positive for alcohol and THC throughout the relevant time period.

¶ 45     In sum, the record reveals that although Robert S. actively worked to complete the tasks set forth in the service plan from May 15, 2021, to February 15, 2022, he continued to abuse substances—the condition which gave rise to the removal of M.S.—during the same time period. Thus, the evidence supported the circuit court's finding that Robert S. failed to make reasonable progress toward the return home goal. Accordingly, we cannot say that the court's finding that Robert S. was unfit, as defined in section 1(D)(m)(ii) of the Adoption Act, was against the manifest weight of the evidence.

¶ 46     Because a parent may be found unfit if the State proves only one alleged ground of unfitness by clear and convincing evidence, we need not address Robert S.'s remaining argument pertaining to the circuit court's finding that he failed to make reasonable efforts. See *Tiffany M.*, 353 Ill. App. 3d at 891. Therefore, we conclude that the court's determination that Robert S. was an unfit parent was not contrary to the manifest weight of the evidence.

¶ 47     B. Best Interest Determination

¶ 48     Robert S. next argues that the circuit court's determination tha it was in the best interest of M.S. to terminate his parental rights was against the manifest weight of the evidence. We disagree.

20

¶ 49    As noted, if the circuit court finds the parent unfit, the matter proceeds to a second hearing, where the State must prove, by a preponderance of the evidence, that it is in the child's "best interests" that parental rights be terminated. 705 ILCS 405/2-29(2) (West 2020); *In re D.T.*, 212 Ill. 2d 347, 366 (2004). During the second step of the process, the focus of the court's scrutiny shifts from the rights of the parents to the best interests of the child. *D.T.*, 212 Ill. 2d at 365. Section 1-3 of the Juvenile Court Act lists the "best interests" factors that should be considered by the trial court when making a "best interests" determination. 705 ILCS 405/1-3(4.05) (West 2020). Specifically, the circuit court must consider the following factors in the context of the child's age and developmental needs: (1) the physical safety and welfare of the child, (2) the development of the child's identity, (3) the child's background and ties, (4) the child's sense of attachments, (5) the child's wishes, (6) the child's community ties, (7) the child's need for permanence, (8) the uniqueness of every family and child, (9) the risks attendant to entering and being in substitute care, and (10) the preferences of the persons available to care for the child. *Id.* The court's best interest determination will be reversed only if it is against the manifest weight of the evidence. *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005).

¶ 50    Here, the circuit court considered the best interest factors and found it in M.S.'s best interest that Robert S.'s parental rights be terminated. The evidence showed that M.S. lived with a relative foster parent in a home with no safety issues. M.S. appeared to be very bonded with her foster parent and paternal cousin, who also resided in the home. M.S.'s foster parent provided her with a loving and caring environment. All of M.S.'s needs were met in the foster home, where she had her own room, bed, and toys. M.S. also attended daycare in her current placement. While there was evidence that M.S. was bonded with Robert S., the evidence indicated that M.S. needed permanency. M.S. lived with her relative foster parent since she was removed from the care of her

21

parents shortly after her birth. In other words, the foster placement was the only home M.S. had ever known. Moreover, the foster parent expressed willingness to adopt M.S. Based on the evidence presented, we conclude that the court's determination that it was in M.S.'s best interest to terminate Robert S.'s parental rights was not against the manifest weight of the evidence.

¶ 51                                    III. Conclusion

¶ 52    For the reasons stated, we affirm the circuit court's judgment terminating the parental rights of Robert S.


¶ 53    Affirmed.