2024 IL App (2d) 240210-U
Nos. 2-24-0210, 2-24-0211, & 2-24-0212 cons.
Order filed August 1, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* L.O., M.A., and J.A., Minors, | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| | ) | |
| | ) | Nos. 21-JA-28 |
| | ) | 21-JA-29 |
| | ) | 21-JA-30 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Kathryn D. Karayannis, |
| Appellee v. Liz A.C., Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Schostok and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's findings that respondent is unfit and that it is in the minors' best interests for her parental rights to be terminated were not against the manifest weight of the evidence.  Affirmed.

¶ 2    Respondent, Liz A.C., appeals from the trial court's orders finding her unfit to parent her children, L.O., M.A., and J.A., and terminating her parental rights.  For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                 A. Fitness Proceedings

¶ 5    Respondent is mother to J.O. (born in 2015), L.O. (born in 2017), J.A. (born in 2019), and M.A. (born in 2021).[1]   J.O. was born substance exposed, and respondent was ordered to complete intact services, including substance abuse treatment, and random drug drops.   However, J.A. and M.A. were also born substance exposed.   Thus, the minors came into care following M.A.'s birth. On May 27, 2021, the court adjudicated the minors neglected and named the Department of Children and Family Services (DCFS) their guardian and custodian.   Ultimately, on March 3, 2023, the State petitioned to terminate respondent's parental rights.   The fitness hearing took place over several days.   We summarize only that evidence we deem relevant to our resolution of the issues on appeal.

¶ 6    Helenn McManaman testified that she was the caseworker from March 3, 2021, to July 11, 2022.   Respondent's service plan ultimately recommended inpatient treatment, substance abuse treatment, parenting classes and coaching, domestic violence and anger management services, a psychiatric evaluation, continued methadone treatment, and a parenting capacity assessment. During the intact case, respondent had received outpatient treatment from Stonybrook, including counseling, group therapy, drug testing, and doctor-prescribed methadone and psychotropic treatment.   Apparently due to the amount of methadone prescribed, respondent was ineligible for an inpatient program.   However, she continued her treatment at Stonybrook, maintained contact with McManaman, provided current contact information, signed releases, and attended court and administrative case reviews, as well as child and family meetings. Respondent completed a

---

[1]J.O. was later placed in the custody of her father (who is not father to the other three children) and is not involved in this case.   Further, David O., father to L.O., J.A., and M.A., is not a party to this appeal.

domestic violence evaluation, which did not recommend further treatment, and completed anger management services. Further, although she successfully completed parenting coaching once, a parenting capacity assessment referred her for additional parenting coaching. Respondent was unsuccessfully discharged from the second round of parenting coaching, as the coach expressed concerns about her interactions with the minors during the coaching sessions. After a psychiatric evaluation, she was diagnosed with major depression disorder, anxiety disorder, and bipolar disorder. Respondent was also diagnosed with severe opioid use disorder.

¶ 7    Diana Furlan was assigned as caseworker starting July 26, 2022. Respondent initially had weekly two-hour visits with her children, but, in October 2022, visitation decreased to monthly visitation. Furlan did not consider extending or increasing visitation and unsupervised visitation was not recommended.

¶ 8    Respondent was drug tested though Stonybrook, but was also to perform weekly drug screening through DCFS. Respondent tested positive for cocaine on December 23, 2021. Respondent started missing drug screens between January and April 2022. She was aware that missed tests were considered positive. A report reflects that she refused to provide a sample in April 2022, and, in April and May 2022, she reported cravings for drugs, and, so, in May 2022, her physician increased her methadone dosage. Respondent also missed screens between July 2022 and March 2023.

¶ 9    Respondent started attending substance abuse treatment at True for Life at the end of May 2022, in part with the hope of reducing her methadone dosage. Apparently, in July 2022, the counselor there informed McManaman that he was concerned that respondent had been in a substance abuse program for so long, yet her methadone dose had not decreased, she did not share much during group sessions, and he questioned why respondent was on methadone if she was not

using opiates. A case note reflects that, in August 2022, respondent was seen in the emergency room after a motor vehicle accident and her urine toxicology screen was positive for opiates; however, no confirmatory testing was performed. In sum, Furlan said that, in 2022, respondent completed 30 out of 47 drug screens, missing 17 screens. The screens she completed were negative for illicit drugs. In 2023, respondent completed 31 out of 35 drops. The screens she completed were negative for illicit drugs. Furlan had informed respondent, however, that missed screens were considered positive because they meant respondent's sobriety could not be confirmed.

¶ 10    Damaris Colon, respondent's parenting coach, testified that she first coached respondent in the summer of 2021, and, then, a second time starting August 3, 2022. Respondent's coaching entailed seven weekly sessions of one-hour duration. Colon observed respondent's lack of bonding with the youngest minors and safety concerns, such as respondent's inability to divide her attention among the minors. Respondent asked Colon to omit her concerns from her report to the court. Colon clarified that respondent asked that she not disclose her concerns "numerous times." Colon specified that the dates respondent asked her to not include her concerns in her report were September 10, and October 29, 2022. Colon provided examples of her concerns, which included respondent reading to the oldest minors, while not engaging in contact with the youngest, such as respondent keeping the youngest minors in a stroller, while she was interacting with the oldest. Colon's concerns regarding respondent's lack of safety with the minors were further exemplified when she described the two youngest minors running around while respondent had no control over them and was not watching them. During another session, the foster parent intervened, because respondent was concentrating on the two oldest minors while the two youngest were running around out of her sight. In December 2022, respondent was unsuccessfully discharged from parent coaching.

¶ 11 In her testimony, respondent agreed that she understood that missed screens were considered positive. She testified that she never tested positive in any of the Stonybrook drops over three years and that *some* (but not all) of the missed DCFS screens were the result of transportation issues, being in the hospital, or the car accident. Respondent explained that the doctors at Stonybrook set her methadone dosage and did not lower the dosage because, due to her cravings, it was too risky. Respondent claimed that McManaman (with whom she described her relationship as "awful") told her that, if she did not lower her methadone dosage, she could "lose" the minors. Respondent said she began using drugs in 2014, approximately five years before she started methadone treatment in 2019. She claimed that methadone was to maintain abstinence from drugs, in her case cocaine. She referred to herself as taking methadone "as an addict, as a recovering addict." Respondent admitted she was diagnosed with severe opioid use disorder, but claimed that, although she had used heroin several times, unlike cocaine, heroin had not become a problem. Respondent admitted she was usually tested through Stonybrook on the day she picked up her methadone, which she received weekly, and typically on the same day. Respondent admitted there were two times she did not take drug tests at Stonybrook, in April and December 2022. However, she testified that, other than methadone, she had not consumed any substances since her December 23, 2021, relapse.

¶ 12 David O. testified, in part, that he was aware through communications with respondent, that, in April or May 2022, respondent was experiencing cravings for drugs and her methadone dosage was increased. At that time, when respondent was having cravings, he noticed changes in her behavior and attitude.

¶ 13 The trial court found that the State proved all allegations of unfitness by clear and convincing evidence. Specifically, it found respondent unfit on the bases that she (1) failed to

maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2022)); (2) failed to protect the minors from an injurious environment (*id.* § 50/1(D)(g)); (3) suffered from habitual addiction to drugs for at least one year immediately prior to the commencement of the unfitness proceeding (*id.* § 50/1(D)(k)); and (4) failed to make reasonable progress toward the return of the minors to her during a nine-month period after an adjudication of neglect, specifically, for the period May 28, 2021, to February 28, 2022 (*id.* §1(D)(m)(ii)). In sum, the court found McManaman, Furlan, and Colon credible, while it found respondent's testimony "somewhat self-serving." Further, although respondent had challenged McManaman's credibility, had described their relationship negatively, and the "tenor" of her argument was that the caseworkers did not do what they should have done, the court found McManaman was credible overall and that respondent's conflicts with the caseworkers and parenting coach did not impact their referrals to services on her behalf or her participation in those services. Indeed, the court expressly found the evidence did not support respondent's implication that personality conflicts reflected that the caseworkers and therapists were against her and had not done what they were supposed to.

¶ 14    The court noted that respondent has a substance abuse issue that will likely be ongoing for the remainder of her life, especially given the length of time she has been in treatment. "I don't think that she willfully wants to be an addict." Furthermore, it noted that respondent has had a substance abuse issue for a very long time, with three minors born substance exposed over six years. Respondent admitted that she had a cocaine problem starting in 2014 and knew she had an addiction that, at one point, was described as a $300-$400-per-day addiction. However, even though she was receiving methadone treatments and was involved in intact services, respondent continued to use substances while pregnant, resulting in two of the minors at issue being born

substance exposed. The court found this evidence reflected a failure to protect the children from conditions within their environment that were injurious to their welfare, as well as reflecting a failure to maintain a reasonable degree of concern or responsibility for their welfare. In addition, the court found respondent suffered from a habitual drug addiction. The court found the evidence clear that respondent knew that, when she failed to go to requested drug drops, they were considered positive results, yet she failed to appear for several drops. Therefore, "the court has to consider them as positive drops and has to consider them as evidence of habitual addiction to substances."

¶ 15    The court also found that, while there was no question that respondent had made efforts, it could not find that she made sufficient, reasonable progress between May 28, 2021, and February 28, 2022. It noted that respondent was unsuccessfully discharged from parent coaching and is not able to successfully parent the children. The court noted that it agreed that it is "hard to keep three children in any semblance of coordination sometimes, but that is why we use a parent coach for these cases to give us this information. They are professionals. There is no evidence that Ms. Colon had any axe to grind[.]" Yet, Colon found a lack of bonding and a concern for safety, especially regarding the younger minors, and explained that, on one occasion, respondent became angry with library staff and, in the interim, two children ran away into the library and a foster parent had to go find and protect them. The court found the "most telling" testimony regarding the parenting coaching was respondent's request "on numerous occasions" that Colon not report her observations. Respondent "clearly recognized that these records were not going to be favorable towards her and was trying to convince the parent coach not to report them." In addition, Colon observed that, when redirected, respondent could become angry, her hands would shake, and Colon recommended, in September 2022, that respondent pursue additional services, including a wellness

exam, doctor's appointment, follow-up with her psychiatrist, and more individual therapy. While this recommendation was made after the nine-month period, the court considered it as evidence of respondent's lack of progress during the period. Further, the court noted that, during the nine-month period, respondent had not been successfully discharged from individual therapy. There was also insufficient progress in parenting based on the parenting capacity evaluation, which reflected respondent possibly being under the influence of medication during the appointment, as well as a continued need for mental health services to address past trauma. Although some of the reports were issued after the relevant period, the court again found that they reflected a lack of progress during the period. Finally, the court found that the evidence was replete that respondent continued to believe that she did not have a heroin addiction and, according to an April 2022 report, she did not understand how her drug usage affected the minors. Again, the court determined that the evaluation, though completed after the nine-month period, supported a finding of a lack of reasonable progress during the nine-month period.

¶ 16                                    B. Best Interests Proceedings

¶ 17     The case proceeded to a best interests hearing. Furlan testified that L.O. was originally placed with her older sibling J.O. in a traditional foster home, where they remained for 1½ years. J.A. and M.A. were placed in a traditional foster home together, where they had remained since February 11, 2021. In July 2022, when J.O. was returned to her father, L.O. was placed with J.A. and M.A. However, in 2023, the foster family gave notice that they could not keep L.O. due to issues with her bonding with their son, and L.O. was returned to her original foster home.

¶ 18     As such, L.O.'s current home was comprised of the foster parents and three girls, including L.O. and another child with whom she remained bonded from her previous placement there. L.O. was sad but adjusting. The home was appropriate and safe. L.O. was six years old, in the first

grade, and changed schools due to the move. She did not have an IEP, although she did attend individual therapy. The foster parents were committed to ensuring L.O. receives the services she needs. Moreover, L.O. was bilingual and the foster family was Latino and bilingual. L.O. was raised with both English and Spanish, along with "other cultural rituals." The foster family included L.O. in family and church activities. Furlan testified that the foster family was committed to providing permanency through adoption. Furthermore, they were committed to L.O. maintaining a relationship with her siblings. Furlan noted that the foster mom had maintained her relationship with both L.O. and J.O., and they went on outings that included M.A. and J.A.

¶ 19    Furlan testified that, when L.O. was moved back to the original foster home, she cried. Furlan attributed that emotion to saying goodbye to her siblings and foster mom. Furlan explained that L.O. was returning to the same school she attended during her prior placement, and she had been adjusting, remembering places she had gone before, and reuniting with the foster child that was in the home before she moved. Furlan saw L.O. in January and February in her foster home. In January, Furlan arrived at the same time as L.O.'s foster mother, and she observed L.O. run up and give the foster mother a big hug. L.O. told Furlan she liked being there. Furlan asked L.O. where she would live, if given the option of living anywhere. L.O.'s first choice was with respondent, and, if she could not live there, her second choice was with her former foster parents because then she could visit the current home and "have both." In February, however, L.O. told Furlan she really liked being in the current foster home. When L.O. was asked where she would like to be, she said she wanted to be there. L.O. was happy and making friends in school. Furlan testified that L.O.'s foster mom said she was adjusting, after struggling in December. There were virtual sibling visits, several times a week, but no in-person visits due to illnesses. L.O. had

attended a birthday party for M.A. Furlan observed a bond, and L.O.'s foster parents reiterated a desire to adopt her. They were also committed to maintaining her sibling relationships.

¶ 20    J.A. and M.A. had been in the same traditional foster home since they came into care. J.A. was four years old, and M.A. was two years old. The home included the foster parents and their son. The home was safe and appropriate, and the minors were included in family activities. J.A. and M.A. appeared comfortable and approached both foster parents for their wants and needs. When they would fall down or received minor injuries, they were comforted by their foster mom. Furlan described J.A. and M.A. as very bonded with the foster family and testified that the minors called the foster parents "momma and daddy." Both minors were in speech therapy. The foster parents were committed to ensuring J.A. and M.A. received the services they needed. J.A. attended half-day pre-kindergarten, and M.A. attended daycare while her foster mom went to the gym. The foster parents were willing to provide the minors permanency, and they were also committed to maintaining J.A.'s and M.A.'s sibling relationships with L.O. and J.O.

¶ 21    Furlan opined that, despite the change in L.O.'s placement, it was in the best interests of all three minors to be free for adoption. Furlan testified that respondent would like to keep the minors together but that, even if adopted and they did not legally remain siblings, the minors would always be viewed as siblings. Furlan acknowledged that, if the minors were adopted, any continued relationship would be up to the adoptive parents, but she noted that maintaining the sibling relationship was important to their best interests.

¶ 22    Respondent testified that she wanted the children returned to her. She testified that she had a place for them where they could live together. Respondent stated that the minors had relationships with her sister, mother, and niece, and that, prior to being placed in foster care, they saw her relatives weekly. Respondent testified that, at visits, L.O. asked for respondent's mother

and niece. She noted that, at the end of visits, the minors' demeanors changed, as did their faces, indicating that they wanted to return to her. Respondent testified that she asked them what was wrong, after which L.O. hugged J.A. and M.A. and started crying. Respondent claimed that L.O. hugged her and said she wanted to go home with J.A. Respondent stated that she loves the minors, and she "worship[s] them with [her] own life." Respondent claimed she could now keep the minors safe.

¶ 23 The trial court found that it was in the minors' best interest for respondent's parental rights to be terminated. It noted that the foster placements were willing to facilitate a relationship amongst all of the children, including with J.O., who was not involved in this case, but that relationship was "very important for the children."

¶ 24 Further, the court noted the minors had been in placements for three years, a substantial period of each of their lives (specifically, it found, for half of L.O.'s life, three-quarters of J.A.'s life, and the entirety of M.A.'s life). The court noted that L.O. had been in the same foster home for two years, separated only by a period of an unsuccessful attempt to place the three siblings together. Attempts over a period of months to try to maintain that placement for L.O. had not worked out, however, she was returned to the placement where she had previously been for around 1½ years, and the court noted that the former foster mom had maintained a relationship with L.O. during her time away. L.O. was in a placement with people who love and care about her, and while it is difficult that she is not with her siblings, she is safe and stable. In addition, the court found that L.O. was doing well in school and making friends, and L.O. was comfortable in her placement and attached and bonded to her foster family.

¶ 25 As to J.A. and M.A., the trial court found they, too, were attached and bonded in their placement, where they had been for three years, the entirety of case, and "very much of their young

lives." The court found the home was safe and stable. Additionally, the court noted that both foster homes were bilingual, and the children were doing well in school and in their individual activities. Finally, the court noted that the caseworker and guardian *ad litem* were both of the opinion that it was in the best interests of the minors to be available for adoption. In addition, the court found that McManaman gave the case proper attention and had "no question in [its] mind about that." Based on those factual findings and its consideration of the statutory factors, the trial court found that the State had established by a preponderance of the evidence that it was in the bests interests of the minors to terminate respondent's parental rights.

¶ 26    Respondent timely appeals.

¶ 27                                    II. ANALYSIS

¶ 28                               A. Findings of Unfitness

¶ 29    Proceedings to terminate parental rights are governed principally by the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2022)) (Act) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2022)). The Act provides a two-step process for the involuntary termination of parental rights. *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010). First, the State must prove that the parent is unfit by clear and convincing evidence. *Id.* Section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)) lists the grounds under which a parent can be found unfit. *In re Tiffany M.*, 353 Ill. App. 3d 883, 889 (2004). Second, if the court makes a finding of unfitness, the court then considers whether it is in the best interests of the minor to terminate parental rights. *Deandre D.*, 405 Ill. App. 3d at 953. The State has the burden of proving by a preponderance of the evidence that termination is in the minor's best interests. *Id.*

¶ 30    As to unfitness, we will reverse a finding of unfitness only where it is against the manifest weight of the evidence, that is, where the determination is unreasonable. *In re D.W.*, 386 Ill. App.

3d 124, 139 (2008). "Generally, a finding of unfitness is entitled to deference and [ ] should be upheld." *In re J.J.*, 201 Ill. 2d 236, 253 (2002). The grounds for finding unfitness under the Adoption Act are independent, and we may affirm the trial court's judgment if the evidence supports any one of the grounds alleged. See 750 ILCS 50/1(D)(m) (West 2022); see also *In re B'Yata I.*, 2014 IL App (2d) 130558-B, ¶ 30.

¶ 31    In her memorandum, respondent attacks the court's findings as to each ground of unfitness. However, we may affirm if any one ground is supported. At a minimum, the court's finding that respondent's habitual addiction rendered her unfit was not against the manifest weight of the evidence. Specifically, section 1(D)(k) of the Adoption Act defines an unfit person as a parent who has an "addiction to drugs, other than those prescribed by a physician, for at least one year immediately prior to the commencement of the unfitness proceeding." 750 ILCS 50/1(D)(k) (West 2022). An addiction to drugs means an inability or unwillingness to refrain from the use of drugs because frequent indulgence has instilled in the person a habitual craving, manifested by an ongoing pattern of drug use. *In re Precious W.*, 333 Ill. App. 3d 893, 899 (2002); *In re D.M.*, 298 Ill. App. 3d 574, 580 (1998). Evidence of indulgence without intermission is not necessary to prove drug addiction, and short periods of voluntary abstinence will not preclude a finding of drug addiction. *In re D.M.*, 298 Ill. App. 3d at 580. "It is sufficient to show that a person has demonstrated an inability to successfully gain control over his or her habitual craving to use the drug." *Id.* If the State has proven by clear and convincing evidence an addiction *during* the relevant one-year period, the court may then *also* consider evidence outside the period. *In re J.J.*, 201 Ill. 2d at 245. For purposes of section 50/1(D)(k), the unfitness proceeding commences when the State files a petition to terminate parental rights. *Id.* at 243.

¶ 32    As noted, at the hearing, respondent acknowledged her addiction, but she argues on appeal that missed drops alone are insufficient to establish by clear and convincing evidence of habitual addiction or active use during the relevant period.  Under the facts of this case, we disagree.  Here, during the one-year period preceding the petition to terminate (*i.e.*, March 3, 2022, to March 3, 2023), and with admitted knowledge that missed drops are considered positive tests, respondent: (1) missed around 17 DCFS drug screens between March 30, 2022, and January 1, 2023; (2) refused two drug tests at Stoneybrook; (3) tested positive for opiates on August 16, 2022, when admitted to the hospital after a car accident; and (4) possibly had a diluted screen.  Respondent argues that the numerous tests she completed were negative for illicit substances, and her treatment providers were not concerned that she was actively using.  She argues that recognizing her problem and sharing with her treatment providers that she experienced cravings, which resulted in their determination, in their medical opinion, that her methadone dosage should be increased, is not the behavior of a parent that has a habitual addiction to drugs.  Respondent notes that she should not be punished for engaging in treatment and having conversations with her providers.

¶ 33    However, our inquiry does not involve the idea of "punishment."  Rather, the issue before us is simple: whether there was sufficient evidence for the court to *reasonably* find habitual addiction in the year preceding the termination petition's filing.  We believe that there was.  Indeed, it was not *unreasonable* for the court to consider approximately *17* presumptively-positive drops as evidence of habitual addiction and as failing to evidence sobriety, even if she also took tests that were negative (some of which, we note, were not random).  Again, respondent admitted that she *knew* missed tests were considered presumptively positive.  Moreover, if the court were to operate in a scheme where there was no consequence for a missed test, there would be little incentive to comply with testing.  Further, while respondent suggested that some missed tests were due to

transportation issues or a hospitalization, she acknowledged that was not the case for all missed tests. See, *e.g.*, *In re Angela D.*, 2012 IL App (1st) 112887, ¶¶ 31-32 (noting that two positive tests were alone sufficient to support a finding a drug addiction, but that even stronger facts existed because, in addition to the two positive tests, the parent failed to appear for at least four scheduled tests during the one-year period); *In re Precious W*., 333 Ill. App. 3d at 899-900 (two positive drug tests during the relevant one-year period demonstrated clear and convincing evidence that the parent was addicted to drugs since the parent was aware that she would be scheduled for random drug testing). Finally, the court did not need to *ignore* that, despite having received years of substance abuse treatment, respondent expressed to her providers and David that she continued to experience cravings for drugs during the relevant period, as this information provided context to the numerous missed tests. As such, the foregoing evidence sufficed to establish clear and convincing evidence of habitual addiction during the relevant period.

¶ 34    We also note that, once the court found sufficient evidence to establish habitual addiction within the one-year period, it was able to *also* consider evidence outside of that period. We think it relevant here, particularly as it might illuminate missed tests within the period, that respondent tested positive for cocaine on December 23, 2021, only two months prior to the start of the relevant period. Moreover, her admitted history of addiction starting in 2014, and the fact that she gave birth to three substance-exposed children over a six-year period, also supports the inference that respondent's missed tests during the period, which she knew would be considered positive, reflected habitual addiction. In sum, the court reasonably found that the State established by clear and convincing evidence that, during the one-year period, respondent demonstrated an inability to successfully gain control over her habitual craving to use drugs. *In re D.M.*, 298 Ill. App. 3d at 580.

¶ 35    Although only one ground, if established, suffices to uphold the court's fitness finding, we nevertheless note that the court's findings that respondent was unfit for failing to protect the children from an injurious environment and failing to maintain a reasonable degree of concern or responsibility for their welfare, again, related to her drug use and the birth of three substance-exposed children (two involved in this case and after intact services began) were also not unreasonable.

¶ 36    Similarly, the court's finding that respondent failed to make reasonable progress toward the return of the minors to her during a nine-month period after the adjudication of neglect, specifically, for the period May 28, 2021, and February 28, 2022 (750 ILCS 50/1(D)(m)(ii) (West 2022)) was also not against the manifest weight of the evidence. Specifically, reasonable progress is an objective standard that requires, at a minimum, "measurable or demonstrable movement" toward reunification and that allows the court to conclude that it will be able to order the children returned to parental custody *in the near future*. *In re Daphnie E.*, 368 Ill. App. 3d 1053, 1067 (2006).

¶ 37    Here, the evidence reflected that respondent did not have increased or unsupervised visitation between May 28, 2021, and February 28, 2022 (or prior to these proceedings). The court found that respondent was unsuccessfully discharged from parenting coaching and is not able to successfully parent the children, and the "professional" parenting coach, Colon, found a lack of bonding, and a lack of safety, especially regarding the younger minors. Further, the court found the "most telling" testimony regarding the parenting coaching was respondent's request "on numerous occasions" that Colon not report her observations, which reflected a lack of progress, and, in September 2022, Colon recommended respondent engage in *additional* services, including psychiatric and physician's appointments and more individual therapy. While this was after the

nine-month period, the court considered this as evidence of respondent's lack of progress during the period. These findings were not unreasonable. Further, the court noted that, during the nine-month period, respondent had not been successfully discharged from individual therapy and had made insufficient progress in parenting based on the parenting capacity evaluation, which reflected respondent's continued need for mental health services. Finally, the court found that the evidence was replete that respondent continued to believe that she does not have a heroin addiction and, as of an April 2022 report, respondent did not understand how her drug usage affected the minors. Again, the court determined that the evaluation, though completed after the nine-month period, supported its finding of a lack of reasonable progress *during* the nine-month period. These findings were not unreasonable.

¶ 38    According to respondent, McManaman, Colon, and Furlan were, essentially, biased against her and reunification overall. She further argues that she performed many positive actions that the caseworkers effectively ignored or did not report and, thus, the evidence before the court was incomplete or failed to paint a fair picture of her progress. However, the court expressly rejected respondent's arguments below, the tenor of which involved her belief that personality conflicts between her and the caseworkers or their neglect of the case contributed to her lack of progress. Moreover, the court did not question respondent's significant *efforts* to comply with her recommended services and treatments. However, it remains that reasonable progress requires measurable or *demonstrable* movement toward reunification. See *Daphnie E.*, 368 Ill. App. 3d at 1067. In short, the evidence supported the court's findings, which were not unreasonable. The court's findings of unfitness were not against the manifest weight of the evidence.

¶ 39                                    B. Best Interests

¶ 40    At the best interests stage, the court "focuses upon the child's welfare and whether termination would improve the child's future financial, social[,] and emotional atmosphere." *In re D.M.*, 336 Ill. App. 3d 766, 772 (2002). "[A]t a best interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The court must consider the following factors in making a best interests determination: (1) the physical safety and welfare of the child; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments, including where the child feels love, attachment, and security; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures, siblings, and other relatives; (8) the uniqueness of every family and child; (9) the risks attendant to entering and being in substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2022). We will reverse a best interest finding only when it is against the manifest weight of the evidence. *In re N.B.*, 2019 IL App (2d) 180797, ¶ 43. Again, a finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the determination is "unreasonable, arbitrary, and not based on the evidence." *In re Tiffany M.*, 353 Ill. App. 3d 883, 890 (2004).

¶ 41    Here, respondent argues that the court's findings were against the manifest weight of the evidence because the court did not detail its findings as they related to each and every factor in section 1-3(4.05), the evidence reflected that L.O. had only been returned to her original foster home for a short time and she was upset at the separation from her siblings, and respondent's own testimony wherein she attempted to testify why it was in the minors' best interest to be returned to her was the subject of numerous sustained objections. Respondent addresses each factor in section

1-3(4.05) and argues that the court erred due to incomplete evidence, or incorrectly failed to consider evidence that, for example, the children were upset at being separated, they had a deep attachment with respondent and called respondent and David "mommy" and "daddy," they had a relationship with respondent's extended family and a cultural identity to preserve, and it was not in their best interests to be separated. She concludes that the evidence so overwhelmingly favors her on the issue of best interests that no contrary finding can stand. We disagree.

¶ 42　The court was not unreasonable in finding that the State established by a preponderance of the evidence that termination was in the minors' best interests. Indeed, as the court noted, for most of their young lives, the minors have not been in respondent's care, not even for unsupervised visits. Despite respondent's suggestion to the contrary, the court was clearly focused on the importance of maintaining and preserving all sibling relationships and noted that the foster parents had expressed both willingness to do so and had taken steps to do so. The court addressed L.O.'s distress at being separated from her siblings, but noted that she was returned to a placement that had maintained a relationship with her while she was gone from their home, she also had a bond with a child in that home, as well as the parents, she was able to maintain a relationship with her siblings, and she was young, improving, safe, and stable. The court noted that the foster families are bilingual, are willing to meet the children's needs, and are willing to provide the minors permanency. Moreover, the minors are doing well in their placements. These findings were not unreasonable.

¶ 43　In sum, when weighing best interests, the trial court properly considered the relevant factors, including that of permanency, and the record supports its findings. Thus, we cannot conclude that the court's finding that it is in the minors' best interests to terminate respondent's parental rights was against the manifest weight of the evidence.

¶ 44                              III. CONCLUSION

¶ 45    For the reasons stated, the judgment of the circuit court of Kane County is affirmed.

¶ 46    Affirmed.