NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 240549-U

NOS. 4-24-0549, 4-24-0550 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 13, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* Z.T. and Zo. T., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macoupin County |
| Petitioner-Appellee, | ) | Nos. 18JA41 |
| v. | ) | 19JA47 |
| Zachary T., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Joshua A. Meyer, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Doherty and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court affirmed the trial court's judgment terminating respondent's parental rights, concluding the court's fitness and best interest determinations were not against the manifest weight of the evidence.

¶ 2    In September 2023, the State filed motions to terminate the parental rights of respondent, Zachary T., as to his two minor children, Z.T. (born June 2011) and Zo. T. (born January 2019). Following fitness and best interest hearings, the trial court granted the State's motions and terminated respondent's parental rights. Respondent appeals, arguing the court's findings are against the manifest weight of the evidence. We affirm.

¶ 3                              I. BACKGROUND

¶ 4    On August 6, 2018, the State filed a petition for adjudication of wardship as to Z.T. (Macoupin County case No. 18-JA-41), alleging he was neglected in that his environment was

injurious to his welfare (705 ILCS 405/2-3(1)(b) (West 2018)). The petition alleged Z.T. resided with his mother, Terri B., whose drug use rendered his environment unsafe. The trial court found probable cause for the petition and an immediate and urgent necessity existed to remove Z.T. from the home. The court granted temporary custody to the Illinois Department of Children and Family Services (DCFS).

¶ 5        On November 8, 2018, the trial court held an adjudicatory hearing and found Z.T. was neglected by Terri. Respondent stipulated and agreed to the adjudicatory order.

¶ 6        On December 12, 2018, the trial court held a dispositional hearing. The court found respondent unable to care for Z.T., made Z.T. a ward of the court, granted custody and guardianship to DCFS, and set a permanency goal of return home within 12 months.

¶ 7        On August 27, 2019, the State filed a petition for adjudication of wardship as to Zo. T. (Macoupin County case No. 19-JA-47), alleging she was neglected in that her environment was injurious to her welfare (*id.*). The State alleged, *inter alia*, Zo. T.'s mother, Flora G., used illegal drugs and failed to obtain treatment and respondent failed to correct the conditions that brought Z.T. into care. The trial court entered an order finding probable cause for the petition and an immediate and urgent necessity to remove Zo. T. existed and granted DCFS temporary custody.

¶ 8        On January 29, 2020, the trial court held an adjudicatory hearing. The court found Zo. T. was neglected in that her environment was injurious to her welfare. Thereafter, there were numerous delays in the remainder of the proceedings for various reasons, including COVID-19 and changes of counsel.

¶ 9        On December 20, 2021, the trial court held a dispositional hearing. The court found respondent was unable and unwilling to care for Zo. T., made her a ward of the court, granted DCFS custody and guardianship, and set a permanency goal of return home within 12 months.

¶ 10        On July 6, 2023, the trial court held a joint permanency review hearing and changed the permanency goal to substitute care pending termination of parental rights, finding respondent had not made reasonable progress, substantial progress, or reasonable efforts toward returning Z.T. and Zo. T. home. The court's order noted respondent completed some of the service plan, but he was resistant to drug tests and continued to have substance abuse issues.

¶ 11        On September 14, 2023, the State filed motions to terminate respondent's parental rights as to Z.T. and Zo. T. The State alleged respondent was unfit as he failed to make reasonable progress toward the return home of the minors during the nine-month period of October 6, 2022, through July 6, 2023, following an adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2022)).

¶ 12                          A. Fitness Determination

¶ 13        On November 13, 2023, the trial court held a fitness hearing. Respondent testified his methamphetamine use worsened when his children were taken away. He was in prison for possession of methamphetamine during the pendency of these cases, had since been released from prison, and was on parole for one more month. During the nine-month period (October 6, 2022, through July 6, 2023), he had a service plan which required substance abuse treatment. In February 2023, a hair follicle test was positive for methamphetamine, and respondent agreed he used methamphetamine before the test. However, at that time, he lied to caseworkers about his drug use. In May 2023, he admitted to his caseworker he was still using methamphetamine and agreed it would have been a bad situation if his children were returned to him at that time. Respondent was working on his addiction but missed drug tests due to his work schedule. If he had taken the drug tests when requested, a couple of them would have been positive. He completed the other items required in the service plan (mental health counseling, domestic violence counseling, and parenting classes), except for drug counseling, which he stated was a never-ending process. He

had never been convicted of selling drugs and never used drugs in the presence of his children. He previously visited his children for two hours once a week, but it was changed to two hours once a month after the positive hair follicle test. The new visitation schedule frustrated him because he believed he was putting in hard work toward returning his children home.

¶ 14    Respondent worked over 40 hours a week installing sod. He had a driver's license and owned a three-bedroom home in Virden, Illinois. The minors visited respondent at his home. Respondent was willing to move to Auburn, Illinois, to keep Z.T. in the same school district. He stated Zo. T. has autism and he attended a few counseling sessions for her in Edwardsville, Illinois, but the distance made it difficult to attend with his work schedule. He asked about transferring the services closer but was informed the services were not available in the area. He missed a visit when he broke his jaw and noted the agency canceled visits several times.

¶ 15    Kiara Simmons, a caseworker with Rutledge Youth Foundation (Rutledge), testified Zo. T. had been on her caseload since 2021. Respondent denied he had a drug issue until the February 2023 hair follicle test and refused any further hair follicle testing. In May 2023, he admitted he was still using methamphetamine. Respondent completed domestic violence counseling and a mental health assessment. He complied with mental health treatment up to May 2023, but there were some complications when the counselor he bonded with no longer worked at the facility. Respondent's visits with the minors were mostly appropriate, but respondent would sometimes struggle parenting both minors and requested to separate the visits. Respondent canceled a visit because one of his tenants was upset with him and punched him in the jaw. Simmons opined respondent's biggest issue was substance abuse and he failed to successfully complete drug treatment during the relevant period. She agreed there was no evidence respondent's

drug use impaired his ability to parent the minors; however, she claimed it was not safe to return minors to a parent who was actively using methamphetamine.

¶ 16       Lisa Hallmark, a caseworker for Rutledge, testified she was Z.T.'s caseworker. Although Z.T. was on her caseload, Simmons directed the majority of services respondent needed to complete with respect to both children. Respondent had the same service plan for each child.

¶ 17       Sarah Usery, a licensed clinical social worker, testified about the parenting capacity assessment she performed on respondent while he visited Zo. T. in February 2023, which was admitted into evidence. Respondent informed Usery he struggled with methamphetamine and used it as recently as December 2022. Usery believed respondent had the capacity and willingness to care for the safety of his children based on his awareness Zo. T. has some issues, support of services being offered, willingness to follow through with recommendations, and attachment to Zo. T. Usery observed respondent was sweet and attentive with Zo. T, who had issues during the visit, and respondent did not get upset or frustrated. She did not have any evidence respondent used methamphetamine during the times she visited with him but acknowledged it was commonly accepted that drugs interfere with the ability to parent. Usery recommended the trial court maintain respondent's parental rights. On cross-examination, it appeared Usery was unaware of respondent's drug use at the time of her assessment and stated if respondent was actively using drugs and not in treatment, she would not support reunification.

¶ 18       Bailey Casteneda, a parent advocate working for Primed for Life, testified respondent first came to her office in August 2022. When respondent's visitation schedule was changed following the positive hair follicle test in February 2023, she filed an appeal with DCFS to increase his visitation. Respondent informed her that he relapsed, and she contacted his treatment provider to confirm they were working on relapse intervention. She recommended

respondent seek an inpatient treatment program, which he did not initiate. Casteneda opined respondent's parental rights should not be terminated because the agency and his caseworkers were not supporting him sufficiently. Specifically, she noted a two-hour travel time to Zo. T.'s appointments and the agency's canceled visitations. She recalled, a few months ago, a caseworker canceled visitation after respondent prepared to have his children for Easter, where he had family members present, arranged for background checks, had presents for the children, and planned an Easter egg hunt. She also did not believe respondent's visitation should have been reduced after the positive hair follicle test because he did not pose an immediate risk of harm to the children. She opined, even considering his current drug use, his visitation should have been increased, as her observations supported he did really well with his children. However, she ultimately agreed respondent needed to be sober, but she did not believe he was given the chance to succeed that he deserved.

¶ 19        Shirley L., respondent's grandmother, testified she fostered Z.T. at the beginning of his case. DCFS terminated the arrangement because it received a report that Shirley allowed Z.T. to be with respondent outside of approved visitation; however, Shirley said this was not true. If respondent regained custody of his children, she would assist him with them, as she was retired. Respondent's sister, who worked at a daycare, would also be able to assist. Shirley never saw respondent under the influence of drugs and thought respondent had a very good relationship with his children. She typically saw respondent two times a week. She was unaware respondent had a drug problem, and whether he did would not change her opinion.

¶ 20        The State asked the trial court to terminate respondent's parental rights. It argued respondent was dishonest with his caseworkers, avoided drug tests, and did not apply the tools provided to him in treatment. Although respondent completed services, he did so while being

- 6 -

dishonest about his drug addiction. Respondent argued he never used methamphetamine while in the presence of the children, there was no issue of domestic violence, he was a good parent, he completed parenting classes, and he was certified to be a good parent pursuant to the parenting capacity assessment. In rebuttal, the State argued the service plan required respondent to abstain from drug use, be honest, and perform drug tests, which he did not do. The State emphasized respondent failed to make progress toward the reunification goal during the relevant nine-month period due to his persistent methamphetamine use.

¶ 21 On November 17, 2023, the trial court issued its written decision. The court found respondent failed to make reasonable progress toward the return of his children during the nine-month period. The court recognized respondent made progress on the service plan but noted little progress was made regarding his drug addiction. None of the witnesses provided evidence the children could have been returned during the nine-month period or could be returned in the near future. The court sympathized with respondent and explained drug addiction can take a long time to remedy, but the court was not required to wait until he made reasonable progress.

¶ 22                                 B. Best Interest Determination

¶ 23 On March 7, 2024, the matter proceeded to a best interest hearing. Kathy M., Z.T.'s foster mother, testified that Z.T. was thriving in his current placement and he did not want to leave. She involved respondent in Z.T.'s life outside of scheduled visitation (sports, camping, and birthdays) and was not going to stop including respondent.

¶ 24 Additionally, Simmons, the caseworker with Rutledge, testified about each child. With regards to Z.T., Simmons explained Z.T. had been in foster care since 2018 and has been in his current placement with Kathy M. since November 2020. Simmons visited Z.T. at his current placement and observed he had a good relationship with Kathy and her husband. Z.T. referred to

Kathy as "mom or nanna" and his foster father as "dad." The foster parents had an older daughter in her twenties who also had a good relationship with Z.T. He was well taken care of and had his own room, bed, clothing, TV, and video games. Z.T. was doing well in school and was involved with sports. Simmons stated respondent still visited Z.T. and it was clear respondent loved Z.T. They are very close and have a good relationship. Simmons spoke with Z.T. regarding his wishes, and he wished to stay in his current placement even though he loved respondent. Considering her interactions with Z.T., his wishes, and his bonds, Simmons recommended Z.T. stay in his current placement and be adopted by his foster parents, who expressed an interest in adopting him.

¶ 25　　　　Simmons also testified regarding Zo. T. and her current placement. Zo. T. was five years old at the time of the hearing and had been in care since 2019. She was placed with Julie B., who she refers to as "mom." Zo. T. and Julie were involved in the community and actively bonded outside of the home with various activities. Zo. T. had her own bedroom, with a bed and stuffed animals. No one else resided in the home other than Zo. T. and Julie. Zo. T. went to daycare and preschool and was doing well. Zo. T. attended speech, language, and occupational therapy. Julie took her to the appointments, and respondent had not attended the appointments in months. Julie also attended parental behavioral training to help her care appropriately for Zo. T. due to her autism diagnosis. Respondent and Zo. T. had built a positive relationship, and Zo. T. really enjoyed seeing her father. Zo. T. was not old enough to articulate her goals or preferences, but Simmons recommended Zo. T. stay in her current placement and be adopted. She explained Zo. T. was taken care of in her current placement and she was sensitive to change.

¶ 26　　　　Simmons testified respondent's visits with the minors occurred in respondent's home and were supervised. The minors were accustomed to the home, and it did not present any

dangers. The minors enjoyed the visits and had a strong bond with respondent. During the visits, respondent was appropriate, and she had no safety concerns with the environment.

¶ 27 Further, Simmons stated neither foster parent expressed an intention to stop visits with respondent. On cross-examination, she stated it could be in the best interest of the minors to maintain their relationship with respondent; however, she was concerned about respondent's ability to maintain sobriety. Since the last court date, respondent had reenrolled in drug classes but had not completed a random drug screen.

¶ 28 Respondent testified he was 35 years old and was still working as a sod installer. He was currently laid off as the work was seasonal. He had three children, and his oldest child was not in the juvenile court system and resided with his mother. Zo. T. had autism, which caused her to be sensitive to certain things. She used to have problems eating, and he would have to make sure she chewed her food sufficiently before swallowing. However, she was growing out of it. Respondent had only been to a couple of trainings to handle Zo. T.'s autism due to the distance, and he was no longer being notified of them. When the children visited with him once a month, his grandparents and his older child sometimes attended. The children call him "dad" and had never been injured during visits, aside from falling down and hurting a knee. When the children visited him, they were excited to see him, and when the visits were over, Zo. T. was not ready to go home. Respondent thought Z.T. wanted to come home. He had no concerns that his children were not being cared for in their respective foster homes. He asked the trial court to maintain his parental rights because if his children could no longer see him, he thought it would have a negative impact. He wanted to maintain the relationship with his children and increase visitation as he continued to work toward returning them to his care. Respondent was currently in a weekly drug

class and admitted he relapsed in the recent past. He stated it had been a few months since he last used methamphetamine, but it would still probably show up on a hair follicle test.

¶ 29    The State argued the best interest factors favored terminating respondent's parental rights. Respondent asked the trial court to maintain his parental rights because the status quo was working for them. The guardian *ad litem* (GAL) opined respondent's parental rights should be terminated for permanency and based on his visits with Z.T. and observations, Z.T. did not trust respondent sufficiently to live in respondent's household.

¶ 30    On March 8, 2024, the trial court issued its written decision terminating respondent's parental rights. The court found respondent had consistent and appropriate visits and loved his children, but he still struggled with substance abuse and admitted he would test positive for methamphetamine if he took a test at the last hearing. The court agreed ending visits would have a negative effect to a certain extent, but all other statutory factors favored terminating respondent's parental rights. The court also terminated Terri's parental rights with respect to Z.T., and Flora surrendered her parental rights with respect to Zo. T.

¶ 31    This consolidated appeal followed. (We note neither Terri nor Flora are parties to this appeal.)

¶ 32                                   II. ANALYSIS

¶ 33    On appeal, respondent argues the trial court's fitness and best interest determinations are against the manifest weight of the evidence. The State posits the court's determinations were proper. We address each determination in turn.

¶ 34    The termination of parental rights is a two-step process governed by the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)). *In re C.W.*, 199 Ill. 2d 198, 210 (2002). The State

must first prove by clear and convincing evidence the parent is "unfit" under any one of the several grounds provided in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). *In re D.T.*, 212 Ill. 2d 347, 352-53 (2004). If the court makes a finding of unfitness, then the State must prove by a preponderance of the evidence that the termination of parental rights serves the best interest of the child. *In re D.D.*, 2022 IL App (4th) 220257, ¶ 27. On review, we determine whether these findings are against the manifest weight of the evidence (*In re J.H.*, 2020 IL App (4th) 200150, ¶¶ 68, 85), which occurs where the opposite conclusion is clearly apparent or if it is unreasonable, arbitrary, or not based on the evidence. *In re Tiffany M.*, 353 Ill. App. 3d 883, 890 (2004).

¶ 35                                              A. Fitness Finding

¶ 36         In this case, the trial court found respondent was unfit in that he failed to make reasonable progress toward the return of the children within nine months following the adjudication of neglect, namely October 6, 2022, through July 6, 2023. See 750 ILCS 50/1(D)(m)(ii) (West 2022). Failure to make reasonable progress toward the return of the child includes the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the minor into care. *Id.* The benchmark for measuring a parent's progress toward the return of the child is his "compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, *and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent*." (Emphasis added). *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). "Reasonable progress" is an objective standard and exists when the court can conclude the parent's progress sufficiently demonstrates the child will be able to be returned to parental custody in the near future because, at that point, the parent will have fully complied with the directives to regain

custody of the child. *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991). Nonetheless, the overall focus remains on the fitness of the parent in relation to the needs of the child. *C.N.*, 196 Ill. 2d at 216.

¶ 37    Here, the children were removed from respondent's care where their environment was injurious to their welfare. Z.T. was in the juvenile court system for over five years, while Zo. T. was in the juvenile court system for over four years. Respondent's service plan required him to complete services for domestic violence, mental health, and substance abuse. While he made some progress with the service plan in that he completed mental health and domestic violence services, he did not make progress with his substance abuse. His use of methamphetamine continued, and although it was not the initial reason for the children being brought into care, it was a condition which later became known and prevented the trial court from returning custody of the children to respondent. See *id.* at 216-17. In February 2023, respondent's hair follicle test was positive for methamphetamine, and respondent did not undergo any further testing during the relevant period. Respondent claimed he missed the drug screens because of his work schedule but admitted a couple of the tests would have been positive for methamphetamine. Respondent testified he was using methamphetamine through May 2023 and agreed it would have been a bad situation if his children were returned to him at that time. Respondent was also initially dishonest regarding his relapse and only later admitted he was struggling with his addiction. Casteneda, his parent advocate, recommended he seek inpatient treatment to address his addiction, but he failed to do so.

¶ 38    Respondent nonetheless argues he was fit to parent his children because the evidence demonstrated he was able to meet minimal parenting standards. Specifically, he points to the lack of evidence he ever used drugs around his children, Simmons's testimony his drug use did not affect his ability to parent, Casteneda's testimony as to his fitness as a parent, and Usery's

parenting capacity assessment. The State argues the trial court's finding of unfitness was proper where respondent's drug addiction persisted. We agree with the State.

¶ 39        As the State points out, although Usery opined respondent's parental rights should not be terminated, she was unaware respondent was missing drug tests or that he was using methamphetamine before and after she completed the parenting capacity assessment. Usery clarified she would not support reunification while respondent was still actively using drugs. Further, although Simmons stated respondent's use of methamphetamine did not affect his ability to parent, she testified it was not safe to return a minor to a parent who was actively using methamphetamine. The same applies to Casteneda's testimony, where she opined respondent was a great parent and his visitation time should have been increased instead of decreased, but she agreed respondent needed to be sober. Respondent failed to cite any persuasive authority to support his position he is fit because, although he was using methamphetamine again in violation of the service plan and his substance abuse recovery, he did not use the drug in the presence of his children.

¶ 40        After careful consideration, we conclude the children's environment with respondent would still be injurious to their welfare. The evidence submitted failed to demonstrate the children could be returned to respondent's care in the near future. Therefore, we cannot say the trial court's finding of unfitness was against the manifest weight of the evidence.

¶ 41                              B. Best Interest Finding

¶ 42        After the trial court finds a parent unfit, the court considers whether it is in the child's best interest to terminate the parent's parental rights. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009). "Courts will not lightly terminate parental rights because of the fundamental importance inherent in those rights." (Internal quotation marks omitted.) *In re M.C.*, 2018 IL App

(4th) 180144, ¶ 34. At this stage, the focus shifts to the child, and "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. The court considers the following factors within the context of the child's age and developmental needs: (1) the child's physical safety and welfare, including food, shelter, health, and clothing; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments, including love, attachment, sense of being valued, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties, including church, school, and friends; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures, siblings, and other relatives; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2022).

¶ 43    Respondent argues the trial court's best interest decision was against the manifest weight of the evidence because the children had a good long-term relationship with him and severing that bond would negatively disrupt the children's lives. He quotes *In re M.F.*, 326 Ill. App. 3d 1110, 1115 (2002), where the court stated, "A child's best interests may be best served by maintaining an already existing relationship with a parent."

¶ 44    In *M.F.*, the respondent-mother was found to be unfit to parent her children due to her schizophrenia, which the court found would continue into the indefinite future and beyond a reasonable period of time. *Id.* However, the court found terminating the respondent's parental rights would not be in the child's best interest where the child (1) was already in the custody of her father as the result of a divorce judgment, (2) visited the respondent regularly over the last several years since the divorce and had an established relationship with her, and (3) would gain no

more stability in her life, as there was no prospect of adoption as she lived with her father. *Id.* at 1117-18. Although *M.F.* and the case at bar are similar in that there is a strong child-parent bond, the children in this case need permanence. Z.T.'s mother, Terri, had her parental rights terminated, and Zo. T.'s mother, Flora, surrendered her parental rights. Respondent continued to struggle with his methamphetamine addiction. Moreover, the bond between parent and child is only one of the considerations when determining the child's best interest. See *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 31 (explaining, while the court must consider all factors set forth in section 1-3(4.05) of the Juvenile Court Act, no single factor is dispositive); 705 ILCS 405/1-3(4.05) (West 2022).

¶ 45　　　　Here, the evidence demonstrated both children were thriving in their foster placements. Z.T. had been in foster care since 2018 and his current placement since 2020. He had a good relationship with his foster parents and referred to them as "mom" and "dad," was well cared for, and was bonded with his foster family. His needs were met, and he did well in school. There was contradictory evidence as to Z.T.'s wishes, as Simmons and the GAL testified Z.T. wanted to stay in his current placement, while respondent testified Z.T. wanted to return home.

¶ 46　　　　Zo. T. had been in custody and in her current placement since 2019. She had a great relationship with her foster mother, and she was well cared for. Zo. T. and her foster mother were bonded and very active in the community, and she was doing well in school. Zo. T. was diagnosed with autism and did not like change. Zo. T.'s foster mother took her to therapy appointments and also took parental behavioral training to help her appropriately care for Zo. T. Simmons and the GAL recommended respondent's parental rights be terminated. Simmons expressed concern over respondent's ability to maintain sobriety and felt the children's need for permanency was best met by terminating respondent's parental rights and allowing them to be adopted. Simmons also testified neither set of foster parents expressed they would discontinue respondent's visits with the

children. Z.T.'s foster mother, Kathy, previously included respondent in Z.T.'s events (sports, birthdays, and camping) outside of scheduled visitation.

¶ 47     The trial court found terminating respondent's parental rights would have a negative effect on the children to some degree, but all other factors favored the termination. We agree. As the court noted, respondent testified at the fitness hearing he would still probably test positive for methamphetamine. After the many years these cases remained pending, the children needed permanency and were placed in suitable homes ideal for adoption. Considering the totality of the evidence and the best interest factors, we cannot say the opposite conclusion is clearly apparent or that the court's decision was unreasonable, arbitrary, or not based on the evidence. *Tiffany M.*, 353 Ill. App. 3d at 890. Thus, we find the court's decision to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 48                          III. CONCLUSION

¶ 49     For the reasons stated, we affirm the trial court's judgment.

¶ 50     Affirmed.